UNITED STATES v. QUAKER OATS CO. et al.

(District Court, N. D. Illinois, E. D. April 21, 1916.)

1. MONOPOLIES ☞24(2)—COMBINATIONS IN RESTRAINT OF TRADE—REMEDIES —EVIDENCE.

In a suit by the government for an injunction under Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 (Comp. St. 1913, §§ 8820-8830), evidence *held* not to show that a monopoly in fact was created by the purchase, by one company engaged in the manufacture and sale of package rolled oats, of the business of a competitor.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ☞24(2).]

2. MONOPOLIES ☞12(1)—COMBINATIONS IN RESTRAINT OF TRADE—ATTEMPT TO MONOPOLIZE—INTENT.

Though no intent is necessary to establish a monopoly in fact, created by the purchase of a competitor's business, there can be no finding of an attempt to monopolize without proof of intent.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. ☞12(1).]

Alschuler, Circuit Judge, dissenting.

In Equity. Suit by the United States against the Quaker Oats Company and others for an injunction. On final hearing. Decree entered dismissing the bill for want of equity.

William C. Fitts, of Washington, D. C., and Morgan L. Davies, of Chicago, Ill., Sp. Asst. Attys. Gen., for the United States.

John P. Wilson, John M. Zane, and Frank F. Reed, all of Chicago, Ill., for defendant Quaker Oats Co.

Adams, Crews, Bobb & Wescott, of Chicago, Ill., for defendants Great Western Cereal Co. and Joy Morton.

Before BAKER, MACK, and ALSCHULER, Circuit Judges, sitting under expediting certificate.

BAKER, Circuit Judge. The clerk is directed by the court to enter a decree dismissing the bill for want of equity.

This case has been brought here under the expediting act. The members of the court have deemed it well to enter the decree at once, without undertaking to prepare—use the time and create the delay that would be occasioned by making—written findings of fact and conclusions of law.

The decree is entered upon the votes of Judge MACK and myself, in favor of that decree, and against the vote of Judge ALSCHULER, who thinks there should be a decree for the complainant—the petitioner.

I will state very briefly my view of the facts and law of the case. At the conclusion the situation remained as it appeared to me upon the government's own statement of what it claimed was the situation with respect to the evidence, and on the government's statement of its views of the law. So far as my own disposition of the case was concerned, I was ready to dismiss the bill upon the government's own showing, because, under section 1, there must be a con-

tract, combination, or conspiracy in existence, in present force at the time the bill is filed. "Contract, combination, or conspiracy"—the collocation of words, of course, is influential, under familiar canons of statutory interpretation, in clearing and restricting each of the words; in short, necessarily they are all of the same genus. Now, when the government admits, or is compelled to admit, that there was no cause of action against Morton or the Great Western when the bill was filed, there could be nothing except a decree of dismissal against all defendants, under section 1. If three men, for example, are indicted for conspiracy to ruin a bank, and the evidence shows that A. had the intent to ruin the bank and was performing acts to ruin the bank, and the evidence also shows that there was no conspiracy on the part of B. and C., then, of course, there would have to be a directed verdict in favor of all the defendants, because one man cannot be guilty of conspiracy. One man or one institution, however, may be guilty of creating a monopoly, or attempting to create a monopoly, and so, legally, the existence of any case here would be dependent upon a violation of section 2.

[1, 2] Without reviewing the evidence, to my mind it is clear that the finding of fact should be that there was no monopoly in fact. Of course, if there is a monopoly in fact (a monopoly by its terms, by the very inherent thought, to my mind indicates an exclusion of others), if there is an exclusion, the taking unto one's self, completely or so far near completion that it is effective, and a monopoly is created, then the intent is wholly immaterial. It would be the fact of monopoly that would be determinative, and not the purposes or intents of the people creating the monopoly; but if no monopoly exists, there may still be an offense for which the remedies—the civil and injunctive remedies—of the statute may be appropriate, if there are acts which constitute an attempt to create a monopoly. But in the matter attempted, to my mind, the element of intent becomes essential. And so when I gathered from the government's own case that there were three defendants, say A., B., and C., and there could be—there was at the time of filing of the petition—nothing chargeable against B. and C., there could not be anything chargeable against A., on the ground of "contract, combination or conspiracy," which to my mind requires the act of more than one person; and when it became apparent that the government was not claiming any monopoly in fact, but only the potentiality, that there could be no finding of any monopoly in fact. The attempt at monopoly brings in the question of intent, that is, looking over to see why everything was done; and in that respect, no wrongful intent was claimed. Therefore it occurred to me that the government made no case.

MACK, Circuit Judge. I feel it my duty under the circumstances of the division of opinion of the court to express my personal views in concurrence with Judge BAKER, possibly in some slight respects differing from the reasons which led him to the conclusion to which both of us agree.

I would say in the first place that the bill, of course, is very much broader and may well justify the enormous expenditure of time and

money that has occurred in this case—very much broader than the claim made on the final hearing, by the government. If the bill had charged only what the government now charges, and had sought only the relief that the government now seeks, I take it that the case would have been ready for hearing in a comparatively short time, and with very much less expenditure. I say this, of course, not in any way as a criticism of the bill or the methods pursued, but as one of the reasons which it seems to me relieves the court of what otherwise might be its duty of a thorough and careful examination of the enormous record that has been presented here.

Then, in the second place, I believe the eminent representative of the government, Mr. Fitts, was under some misapprehension as to the reason for calling on him after his associate had made a statement of facts. This is a hearing in the court of original jurisdiction, and I personally felt it the duty of the representatives of the government, the plaintiff in the case, to present in the opening statement, not merely their version of the evidence, but also their view of the law itself, both for the enlightenment of the court and in accordance with the practice that prevails in this state, in order to give opposing counsel the opportunity to answer, and thereby avoid a response after the government's counsel had answered defendant's counsel. It was for that reason, for the purpose of having the government's views both as to the law and the facts fully presented, that I desired to hear from Mr. Fitts before hearing from the defense.

I agree, however, with Judge BAKER, that after the government had fully presented its case it seemed to me that neither by the facts nor under the law were the contentions of the government established. While the views expressed by Judge BAKER as to the meaning of the word "combination" are supported both by the collocation, the phrase being "contract, combination or conspiracy," and by the usage of the word at the time the act was passed, certainly it may well be —and it is unnecessary now for me to express my personal opinion on the question—it may well be that the word "combination" is much broader and more significant, and I shall assume that the contention of the government is entirely sound. I do not mean to express any personal dissent from this contention that there may be, within section 1, a combination, not of persons, but a combination of the instrumentalities of commerce, and that when one man combines within his ownership competing instrumentalities of commerce with the intent or with the effect thereby unduly to restrain trade, and that ownership continues and the combination continues, that such combination may be enjoined. If that be the correct definition of "combination," then of course the purchase by one dealer in rolled oats of any part of the business or any of the instrumentalities of the business of the other dealer in rolled oats, is a combination, and beyond all question all combinations restrain trade.

But the question is whether it is an undue restraint of trade, and that depends upon the entire situation, the nature of the business, the competing elements throughout the region of interstate commerce —the possibilities of further competition. Furthermore, and without

expressing an opinion now as between the majority and the dissenting judge in the Harvester Case ([D. C.] 214 Fed. 987), inasmuch as that case is pending in the Supreme Court, and assuming, and again without intimating any personal dissent—assuming that the majority in the Harvester Case is absolutely and entirely right, and assuming, further, that both an undue restraint of competition and a monopolization in business may arise, where the situation is such that, without any wrongful acts of any kind, one man or one company has it within his power, by reason of the combination, or by reason of the transactions which lead to the existence of that power, unduly to restrain competition or to monopolize the interstate commerce, I fail entirely to find on the facts as presented by the government, supplemented by the presentation of the defense, either an actual monopoly, or that power which, in view of the entire situation of the rolled oats business, tends to show the existence of the possibility of monopolizing or unduly restraining the trade in rolled oats. It seems to me that the subject-matter is not Quaker Oats and Mother's Oats, but rolled oats.

Assuming even that it is not rolled oats, but package oats, rolled oats as sold by the trade throughout the country in packages for retail consumption, that being the largely prevailing method of conducting the business, there is, on the facts, to my mind, no undue restriction of competition, and not in the slightest degree a monopolization of the product of the business, and that because of this, that while the Quaker Oats Company and the Great Western were the two largest factors in the business, there were numerous competitors, and there was the fullest possibility of the most extended competition, and the size and the power of neither of these companies, either single or combined, that is, the power of the Quaker Oats, after securing the Mother's Oats, were not such as could prevent the most unlimited competition in package rolled oats. The strength of both of these companies was due to the tremendous advertising of their brands. By virtue of that advertising the public had come to demand, not merely rolled oats, not package rolled oats, but Quaker rolled oats, or Mother's rolled oats, and yet the instrumentalities of satisfying the demands of the public, the wholesale business throughout the country, the retail business throughout the country, was all in most strenuous opposition to and competition with these two companies. The very elements that they necessarily utilized in the distribution of their product were their own chief competitors.

I do not speak now of the fact that the business concededly was in all respects legitimately conducted. That is not determinative. I agree with the government that a potential monopoly that has failed to exercise its tremendous power, and has become and has been a very good trust, is none the less subject to the law; but we must first find the undue restraint of competition, or the probability or possibility thereof. The very fact that the subject-matter of the competition in rolled oats was a product manufactured without the slightest difficulty, without the slightest hindrance, by reason of any patents, either in the product or machinery for manufacture, from

a raw material of which the supply for all practical purposes was absolutely unlimited, and to be had in all parts of the country—a supply of which the rolled oats represents maybe 1 or 2 per cent.—that with very small capital, as testified to here, $25,000 to start a small mill, and $65,000 to start a 500-barrel capacity, anybody could go into that business, negatives undue restraint.  Now, it is true that anybody that went into the business and attempted to sell to the public package rolled oats would run up against the tremendous advertising power, against the tremendous advertising value of Quaker Oats and Mother's Oats; but competition could be established, and it has been established, and that which has existed all along is none the less real.  The fact that one of the competitors, or two of the competitors, or one competitor combining the two competitors, has acquired a preponderance in the business of the package rolled oats, due to a tremendous expenditure for advertising, to my mind does not show that thereby there has been any undue restriction of competition.  In no sense has the competition been restricted, so far as I have been able to comprehend, by the union of Mother's Oats and Quaker Oats as against the rest of the world.

It is true that by the combination of ownership there may be a restriction of the competition between the two brands of rolled oats, Quaker Oats and Mother's Oats; but there is no restriction—no country-wide restriction—of the competition, and no possibility thereby of creating a country-wide restriction of competition in rolled oats, or in package oats.  Every wholesaler in the country is competing, and competing hard, and, so far as the evidence as presented to us shows, is competing successfully, in the package trade.  It is true the Quaker Oats Company is prospering, and prospering tremendously, notwithstanding this competition.  That is due to its past, present, and continuing advertising.  If that advertising is causing a misapprehension on the part of the public, there are other remedies to correct that misapprehension.  If the Quaker Oats Company is falsely asserting its claims, there are other methods of correcting their false statements.  I do not for a moment say that it is; I merely assume that possibility.

Now, the government has urged that the real wrong is in the combination of these advertised brands in one hand, and that the contract which effectuated that condition is illegal.  While on the facts presented it seems clear that the Quaker Oats did not go out with any intent to destroy the Great Western, to buy it off, and while it seems clear that the Great Western was anxious to sell out because of its actual insolvent condition, I do not think that that affects the question, either under section 1, or under the monopolization clause of section 2.  The intent with which the Quaker Oats purchased Mother's Oats would be important only in the consideration of a violation of the prohibition against attempting to monopolize.  So that for the purposes of this case, for the purposes of the consideration of the violation of section 1, and of the first part of section 2, the creation of an actual monopoly, it seems to me immaterial whether the Great Western came to the Quaker Oats, or whether the Quaker Oats went to the Great

Western. I should reach the same conclusion, even if the Quaker Oats had gone to the Great Western, for the very purpose of acquiring Mother's Oats and thereby lessening the competition. Every purchase between two people in the same business, one buying out the other, is necessarily a lessening of the competition; but as long as the property is such that the fullest opportunity for country-wide competition exists, the field being open to everybody with but small capital, there being no patent rights, there being no other hindrance to the freest development of individual enterprise, I fail to see anything undue, anything unreasonable, in the restriction of competition that results, although it be the largest of the several competing firms that buys out the second largest.

For that reason, I concur in the order dismissing the bill.

ALSCHULER, Circuit Judge. I cannot concur in the conclusion of the majority of the court, nor, of course, in some of the reasoning whereby that conclusion was reached. It was, and I think properly, deemed wise to expedite this case by announcing the decision as soon as it was reached, without waiting for the ordinarily longer process of preparing written opinions.

At the time of making the contract of purchase of which the government complains, of the total rolled oats output in and for the United States, the Quaker Oats Company had, roughly speaking, 55 per cent., the Western Cereal Company between 15 and 20 per cent., and the remainder, divided in various proportions between something over a dozen others, who were in the same business, the largest of them quite small in comparison with the Western. About half the Quaker output was of package goods under the advertised brand of "Quaker Oats," and a much larger proportion of the Western product was put out under the advertised brand of "Mother's Oats."

Competition in the market between these two brands was keen. Quaker had lost some ground in 1910 and 1911, and Mother's had rapidly gained in volume. The Quaker Company showed large profits, while the Western was running behind financially. There was much evidence as to the cause for the losses of the latter, the government claiming it was improper conduct of its officers; but to my mind this is quite immaterial to the issue here involved, particularly as it is not charged that the Quaker interests were instrumental in bringing about such conduct, if any there was.

The two companies themselves were composed of various units which had theretofore been brought together, the manner whereof could not be related in small compass; but suffice to say that even if, as claimed by the government, this was in some respect obnoxious to the law, these long-existing associations and combinations, culminating in these two major companies here involved, are not attacked by the bill, but it is sought only to affect thereby the contract of June 21, 1911, under which the Quaker acquired certain properties of the Western.

Without reviewing the voluminous details of conditions and negotiations leading to the contract, it seems clear to me that both parties to it contemplated that the Great Western should permanently with-

draw from participation in the rolled oats business. This is strenuously denied by the defendants, but it seems to me that the circumstances, to which I will refer very briefly, could lead to no other conclusion than that this was the purpose and intent of the transaction.

The directors' and stockholders' resolution adopted by the Western authorizing the transaction distinctly set out its purpose, in reciting that in the judgment of the board of directors it was for the best interests of the company to discontinue the manufacture of oatmeal, rolled oats, and crushed oats. The defendants contended that this was but a form that was adopted to assure the trustee of the mortgage or trust deed covering the real estate contracted to be conveyed that it would have the power under clauses of the trust deed to make a conveyance of property that was no longer of use to the company. But the contract itself seems to dispel all doubt on the subject. It provides primarily for the conveyance of two plants of the Western, one at Joliet and one at Ft. Dodge, but not of several other plants which it possessed. After providing for the conveyance of these two plants, and for all of the property contained therein, the fifth section conveys:

"All and singular the business, good will, contracts for sales, formulas, processes, trade secrets, copyrights, trade rights, trade-marks, trade-names, trade insignia, both registered and unregistered, and all registrations and certificates of registration, at home and abroad of any such trade-marks, trade-names, and trade insignia, etc., relating to or in any way connected or associated with the manufacturing, putting up, packaging, and sale of oatmeal, rolled oats, crushed oats, and commercial mixed feed, possessed or controlled or claimed by the party of the first part" (which is the Western).

It includes all, whether of the two mills specifically conveyed, or any other of the various mills in which it was theretofore manufacturing oat products. And in clause 7 the first party, the Western, covenants and agrees at once to turn over and deliver to the Quaker Company complete enjoyment of all such business and good will and trade-marks and the like, and that will not directly or indirectly interfere with the use and enjoyment thereof by the Quaker Company, nor use or authorize others to use the same. All labels, advertising materials, and premiums, boxes, and cartons are included, and the eleventh section provides that for the same consideration (which is stated in the instrument to be $10 and other good and valuable consideration, but which in fact was a little over $1,000,000) for which the plants at Joliet and Ft. Dodge are conveyed, the enumerated intangible things are also conveyed. Section 14 provides that the first party shall turn over all contracts for the oat products of the business of which the good will and trade-marks are sold, and a list of all the customers which the first party has in the oat product business.

Included in the sale there was also, for another consideration, being the appraised price thereof, all of the product on hand and all of the materials for the manufacturing of these products, in all of the mills and plants of the Western, not alone those at Joliet and Ft. Dodge. The appraised price paid for all of such products and materials was upwards of $400,000. This parting with its business,

good will, contracts, customers, marks, brands, advertising matter, stock, and materials, and stripping itself of the very essentials for building up and holding its immense trade, manifests an intention on the part of the seller permanently to retire, and upon the part of the purchaser that the seller shall so retire, from the oat product business in any form. The retention by the Western of its other plants, so far as indicating, as claimed, an intention to continue in this business, must have reference to the products of grains other than oats, in the manufacture of which other products both of the companies were then and theretofore heavily engaged.

Considering the relations of these companies toward each other, and toward the trade and the public, and attaching to the contract that probative value which common observation and ordinary experience will give it, I cannot escape the conclusion that the contract is violative of the statute. The controlling fact seems to me to be that the Quaker Oats Company, already through its domination of the major part of the entire output, in this advantageous position, took over the property of its largest competitor, whereupon the latter with its remaining mills ceased longer to be a factor in the oatmeal trade. That as the result of this acquisition the Quaker Oats Company did or could materially control or affect the raw product, the oats, is not reasonable to suppose; that the competition in the bulk rolled oats has not been appreciably affected since the contract may be said to be fairly established by the evidence. That by the added power of the Quaker Company, through its absorption of this its most potent competitor, it is in greatly improved position to seriously affect the trade through price manipulation of such goods, or other action easily possible with such power, is to me self-evident.

Although, as it was testified, $50,000, might build a fair-sized mill, the existence of this single powerful unit would be a strong deterrent to such an undertaking. But that the transaction in question did remove the strong competition theretofore existing between the Quaker Oats and Mother's Oats brands, in each of which the respective companies had theretofore built up a vast trade totaling far more than that of all others combined, is but another way of stating that the contract in question was consummated, for this was its necessary as well as its intended effect.

It is not tenable to say that in this transfer of the trade-marks, brands, and good will, rather than of tangible property, there was manifested no intent or tendency to monopolize trade in the product. The trade-marks and brands constitute the effective instrumentalities whereby a great trade was built up, and that there was real competition in these advertised goods would appear, not alone in the very nature of things, but in the fact that, as a probable result, the Quaker Oats brand output had somewhat declined, while the Mother's Oats was rapidly on the increase. True, the price of Quaker Oats package goods has not been increased, but this is not essential to the establishment of the existence of monopoly or of undue restraint of trade. If the Quaker concern has thereby better intrenched and secured itself against successful competitive attack, the tendency to trade restraint

and monopoly is apparent, and the law may be thereby, and in my judgment, under the circumstances shown, has been, transgressed. If the competition in package goods had been maintained, the Quaker might have lowered its prices, or done something else disadvantageous to itself and of advantage to the buying public, in order to maintain its commercial status. To say that people may buy the unadvertised or bulk product, which is equally good, at much lower prices, seems to me to be beside the question. It is not for the courts to tell the people what they may or shall buy.

If these companies have exploited their respective brands so successfully that the public by the hundreds of thousands have been induced to believe that they possess superior merit, and thereby the companies respectively have established this vast package trade in these goods, if then in some way they combine, or one sells to the other, for the advantage thereby accruing, and in such manner they unduly restrict trade and promote monopoly in these products, they ought not, in defense of such transaction, be heard to say that, if the public do not like it, they may get goods of other brands or go without any brand at all. That the great trade has been established in these particular goods through advertising does not in my judgment affect the proposition. The fact that through judicious and successful advertising two concerns each secure a vast trade, equal or greater than the other combined similar trade of the country, does not of itself authorize the two to unite to eliminate the competition between them. It is to the credit of the Quaker Company that it does not appear to have resorted to those coercive and terrorizing tactics for increasing or maintaining its trade, so often found to be the case where a business establishment has obtained the comparative ascendency and power of this one; but in my judgment this does not obviate the apparent undue restraint or attempted undue restraint of trade, which the entering into this contract seems to me to manifest.

There was for the defendants evidence to the effect that the real thing which was the subject of the purchase was the brands, trademarks and good will of the Western in the oatmeal trade, and that the tangible property was taken only as an incident, because deemed essential to secure title to the intangibles, such as brands, trade-marks, and good will. If for this $1,000,000 or so of consideration, the Quaker Oats had obtained oats and machinery and real estate and other facilities for maintaining and enlarging its business and plant, things which might be purchased elsewhere, it might with better grace maintain that there was nothing in the transaction that tended to destroy competition and create monopoly. What did it buy for its $1,000,000 of investment? It is clear to me that it purchased the business extinction in the oat product trade, and the commercial status therein, of its greatest and most powerful rival, thus strengthening the purchaser's already strong grasp upon the entire industry, through the added force of this very considerable unit, thenceforth joined with its own. To my mind, this of itself, quite regardless of the manner in which this enlarged power has been exercised in the interim between the making of the contract and the filing of the bill, manifests in the

contract such an undue restraint of the interstate trade and commerce thereby affected, and such a purpose and tendency to monopolize, as comes fairly within the condemnation of the statute, a statute which denounces, not commercial growth, nor strength, nor power, nor proportion, but only combination or device, by whatever form they may appear, calculated and tending unduly to restrain interstate trade and commerce, or to eliminate competition, and, in the words of the statute, "to monopolize any part of the trade or commerce among the several states."

Entertaining these views, I believe there should be a decree for the government, the precise scope of which, under the circumstances, it is hardly necessary for me to discuss.

