**NELSON RADIO & SUPPLY CO., Inc.**
**v. MOTOROLA, Inc.**

No. 14012.

United States Court of Appeals,
Fifth Circuit.

Dec. 17, 1952.

Rives, Circuit Judge, dissented.

Samuel M. Johnston, Mobile, Ala., for appellant.

Thomas A. Reynolds, Calvin Sawyier and Charles E. Green, Chicago, Ill., Marion R. Vickers, Mobile, Ala., for appellee.

Before BORAH, STRUM, and RIVES, Circuit Judges.

BORAH, Circuit Judge.

This is an appeal from a judgment of the Court below dismissing an action brought by Nelson Radio and Supply Company, Inc., under Section 15, Title 15, United States Code, against Motorola, Inc. to recover treble damages for alleged violations of the Antitrust Act, as amended, 15 U.S.C.A. § 1 et seq. The cause was dismissed on the ground that the amended complaint failed to state a claim upon which relief could be granted under the Act. Thereafter, Nelson Radio and Supply indicated that it did not desire to amend its complaint further and this appeal followed.

The facts alleged in the amended complaint may be summarized as follows: For several years prior to February 10, 1949, plaintiff was engaged in the business of selling and distributing heaters, radio receivers, radio phonograph combinations, and communication equipment, together with parts and accessories therefor, sold to it by Motorola, Inc. The defendant, Motorola, Inc., is engaged in the business of manufacturing and selling this merchandise and shipping it in large quantities in interstate commerce to distributors, such as the plaintiff, located throughout the country. Through the years the plaintiff expended large sums of money to increase the sales and distribution of Motorola mechandise within its assigned territory, which encompassed certain counties in Alabama and Florida, and the business of the defendant likewise increased until it achieved a commanding position in the field.

Prior to January 2, 1948, the defendant submitted to plaintiff for its signature a wholesale distributor's agreement or franchise for the year 1948. This agreement provided, among other things, that the merchandise therein referred to should consist of heaters, radio receivers, radio phonograph combinations, and television receivers, or parts thereof, manufactured by the defendant and sold under the name Motorola but should not include defendant's communication equipment and any of defendant's articles sold under any name other than Motorola. The agreement reserved to the defendant the complete right to distribute the excluded equipment and articles within the plaintiff's territory, including the appointment of distributors therefor. This provision of the new agreement effected a substantial change, for although communication equipment manufactured by the defendant had not been specifically included in previous distributor agreements between the parties, the defendant in the past had honored sales of its communication equipment made by the plaintiff in said territory. At the time the defendant submitted this new agreement, it informed the plaintiff that the latter could not sell communication equipment manufactured by others in competition with defendant. Plaintiff now claims that it was coerced into signing the 1948 franchise agreement by threats of termination of its existing distributor agreement and the refusal to make a new one.

During the months of November and December, 1948, and the months of January and February, 1949, the parties were negotiating for a renewal of the 1948 agreement. In these negotiations plaintiff insisted that it be allowed to acquire, distribute and sell the defendant's communication equipment, or that it be allowed to sell merchandise included within the term Motorola together with communication equipment acquired from other manufacturers. The defendant resisted these demands, negotiations were fruitless, and on February 10, 1949, the defendant terminated its existing contract and refused to enter into a new contract with the plaintiff unless the plaintiff would forego its demands.

After setting forth the facts as summarized above, the complaint contains the following allegations:

"Since November, 1947, said defendant, and Paul V. Calvin, the president and a director of defendant's corporation, and William H. Kelly, its sales manager, and its officers, employees, representatives and agents, who have been actively engaged in the management, direction, and control of the affairs and business of said defendant in and in connection with the interstate trade and commerce in said Motorola and communication equipment, unlawfully have engaged in the City of Chicago, Illinois, in a conspiracy in restraint of the aforesaid trade and commerce among the several states in Motorola and said communication equipment; and said defendant and the other persons hereinabove mentioned conspired together to do all acts and things and to use all means necessary and appropriate to make said restraint effective including the means, acts and things more particularly hereinafter alleged.

" * * * (a) on, to-wit, from November, 1947, until the 10th. day of February, 1949, they advised and notified plaintiff that no longer would defendant permit plaintiff to distribute and sell communication equipment, and that if it sold or distributed communication equipment manufactured by others, that it would terminate or cancel its distributor's agreement or franchise contract made with plaintiff; (b) on the 10th day of February, 1949, it terminated plaintiff's distributor's agreement or franchise with the defendant as its distributor in said territory, because of plaintiff's refusal to agree not to sell and distribute communication equipment manufactured by others in said territory; (c) on, to-wit, the 10th day of March, 1949, it refused to sign and execute the distributor's agreement for said territory for the year, 1949, unless plaintiff would agree not to sell within said territory * * * communication equipment manufactured by

others in competition with defendant's said communication equipment, which proposal plaintiff refused to agree to; and (d) on and after * * * the 10th day of March, 1949, it refused to sell and ship any further Motorola and communication equipment so manufactured by it as aforesaid to the plaintiff."

The complaint further alleges that the defendant is selling and shipping Motorola merchandise to its other distributors throughout the United States under distributor agreements substantially the same as the agreement set forth above; that the defendant manufactures and sells more than 50% of the communication equipment manufactured and sold in interstate commerce in the United States; that its practice of selling Motorola merchandise in interstate commerce upon the condition, agreement, or understanding that such distributors would not use or deal in communication equipment of defendant's competitors had the effect of substantially lessening competition in commerce; and that the termination of the plaintiff's contract, unless it would agree not to use or deal in competing equipment, was likewise illegal; and its effect was to substantially lessen competition in such commerce.

The relief prayed for is based upon Title 15, United States Code Annotated, Section 15, which provides that any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor and shall recover threefold for the damages by him sustained.

Section 1 of the Sherman Act, 15 U.S.C.A. § 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal". Insofar as Section 1 of the Sherman Act is concerned, plaintiff relies upon that portion of the language of the statute which denounces a "conspiracy, in restraint of trade or commerce among the several States". It is the well recognized rule that in pleading a conspiracy in an action such as this, a general allegation of conspiracy,

without a statement of the facts constituting the conspiracy to restrain trade, its object and accomplishment, is but an allegation of a legal conclusion, which is insufficient to constitute a cause of action. Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, 148 A.L.R. 841; Neumann v. Bastian-Blessing Co., D.C., 70 F.Supp. 447, 448.

But apart from this infirmity we think the allegation claiming the existence of a conspiracy under Section 1 contains a more fundamental defect. It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation. Here it is alleged that the conspiracy existed between the defendant corporation, its president, Calvin, its sales manager, Kelly, and its officers, employees, representatives and agents who have been actively engaged in the management, direction and control of the affairs and business of defendant. This is certainly a unique group of conspirators. The officers, agents and employees are not named as defendants and no explanation is given of their non-joinder. Nor is it alleged affirmatively, expressly, or otherwise, that these officers, agents, and employees were actuated by any motives personal to themselves. Obviously, they were acting only for the defendant corporation. It is true that the acts of the corporate officers may bring a single corporation within Section 2 of the Sherman Act, which covers an attempt to monopolize, but this is not because there exists in such circumstances, a conspiracy to which the corporation is a party. And, of course, a corporation and its subsidiaries can be guilty of a conspiracy in restraint of trade but that involves separate corporate entities. In the instant case we do not have any of those situations and it appears plain to us that the conspiracy upon which plaintiff relies consists simply in the absurd assertion that the defendant, through its officers and agents, conspired with itself to restrain its trade in its own products. Surely discussions among those engaged in the management, direction and control of a corporation concerning the price at which the corporation will sell its goods, the quantity it will produce, the type of customers or market to be served, or the quality of goods to be produced do not result in the corporation being engaged in a conspiracy in unlawful restraint of trade under the Sherman Act. Plaintiff can come within the meaning of Section 1 of the Act only by claiming the existence of a conspiracy, but no conspiracy could possibly exist under the facts disclosed. The Act does not purport to cover a conspiracy which consists merely in the fact that the officers of the single defendant corporation did their day to day jobs in formulating and carrying out its managerial policy. The defendant is a corporate person and as such it can act only through its officers and representatives. It has the right as a single manufacturer to select its customers and to refuse to sell its goods to anyone for any or no reason whatsoever. It does not violate the Act when it exercises its rights through its officers and agents, which is the only medium through which it can possibly act.

We think that in naming these officers, employees and agents as conspirators the plaintiff was mistakenly attempting to avail himself of the doctrine that what it would not be illegal for a corporation to do alone would be illegal as a conspiracy when done with another legally separate person or entity. However, as stated by Judge Chesnut in Arthur v. Kraft-Phenix Cheese Corporation, D.C., 26 F.Supp. 824, 830, "* * the inclusion of the defendant's agents in the alleged conspiracy would seem to be only the basis for a technical rather than a substantial charge of conspiracy because obviously the agents were acting only for the defendant corporation." In the absence of any allegation whatever to indicate that the agents of the corporation were acting in other than their normal capacities, plaintiff has failed to state a cause of action based on conspiracy under Section 1 of the Act. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219; Fleetway, Inc., v. Public Service Interstate Transp. Co., 3 Cir., 72 F.2d

761; U. S. v. Quaker Oats Co., D.C., 232 F. 499; Arthur v. Kraft-Phenix Cheese Corporation, supra; Neumann **v.** Bastian-Blessing Co., supra.

This leaves for our consideration plaintiff's allegation of a cause of action under Section 3 of the Clayton Act, 15 U.S.C. § 14, which provides in part as follows:

"It shall be unlawful for any person engaged in commerce * * * to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, * * * for use, consumption, or resale within the United States * * *, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

In considering the applicability of Section 3 of the Clayton Act it must be borne in mind that plaintiff is here suing for injury to his business or property proximately resulting from an alleged illegal termination of his distributor contract and refusal to do business with him. Therefore, assuming that a system of exclusive wholesale distributorships such as that here involved comes within the ban of Section 3 of the Clayton Act, it is obvious that any injury to plaintiff's business is in no way the result of any agreements restricting distributors in other territories. That is to say, it is the absence of a contract with the plaintiff, not the presence of agreements with distributors in other parts of the country, of which the plaintiff must complain.

■ The contract dated January 2, 1948, specifically provided that the agreement should remain in force until December 31, 1948, and that if for any reason whatsoever their relations should continue beyond that date, such continuance should not be deemed a renewal thereof and the agreement would be subject to immediate termination upon written notice by either party. Therefore, when the defendant severed their business relations on February 10, 1949, it did not terminate an existing contract which still had some period of time to run. On the contrary, it was actually a mere refusal to deal further with the plaintiff.

■ Section 3 of the Clayton Act, by its express terms, covers only leases, sales, or contracts actually made on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods of a competitor of the lessor or seller. There is nothing whatever in the Act to suggest that it covers a situation where the manufacturer refuses to make a sale or enter into a contract, and it has been stated time and again that a manufacturer has the unquestioned right to refuse to deal with anyone for reasons sufficient to himself. U. S. v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992; U. S. v. Schrader's Son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471; Frey & Son v. Cudahy Packing Co., 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892; Arthur v. Kraft-Phenix Cheese Corporation, supra. For that matter, a review of all of the cases decided by the Supreme Court involving Section 3 of the Clayton Act, reveals that in each of them there was an agreement and not a mere refusal to deal.[1] There is a real difference

---

1. Standard Fashion Co. v. Magrane Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L. Ed. 653; United Shoe Machinery Corp. v. U. S., 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708; Federal Trade Commission v. Curtis Publishing Co., 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408; Federal Trade Commission v. Sinclair Refining Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746; International Business Mach. Corp. v. U. S., 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085; Pick Mfg. Co. v. General Motors Corp., 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4; Fashion Originator's Guild v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; International Salt Co. v. U. S., 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Standard Oil Co. v. U. S., 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371.

between the act of refusing to deal and the execution of a contract which prevents a person from dealing with another. The plaintiff has not been injured as the result of a contract, either express or implied, which sought to prevent him from dealing in the goods of any competitor of the defendant.

The judgment of the District Court dismissing the amended complaint was right and it is hereby affirmed.

RIVES, Circuit Judge (dissenting).

As I understand the amended complaint, it charges that the defendant, Motorola, Inc., a corporation organized under the laws of Illinois, and its President, Paul V. Calvin, its Sales Manager, William H. Kelly, and its other managing officers, employees, representatives and agents unlawfully engaged in a conspiracy in restraint of trade and commerce among the several states in the products sold under the name of "Motorola" and in communication equipment. The defendant manufactures and sells more than 50% of the communication equipment manufactured and sold in interstate commerce in the United States. Of the products sold under the name of "Motorola", the defendant had approximately 80 distributors, including this plaintiff, located throughout the 48 states of the Union. Under threat of termination of their franchise most of these distributors have been wrongfully coerced into an arrangement with the defendant permitting them to sell the products included under the name of "Motorola" but prohibiting them from selling communication equipment manufactured by the defendant or communication equipment manufactured by others. The plaintiff refused to submit to such an arrangement and his franchise as a distributor was cancelled resulting in the loss of a profitable business built up over a period of years.

Taking the averments to be true, as we must on motion to dismiss, a scheme has been devised by defendant's agents under which its dealers throughout the country have been coerced into entering into contracts in restraint of trade and in clear violation of Section 3 of the Clayton Act, 15 U.S.C.A. § 14. The plaintiff refused so to be coerced with resulting cancellation of its franchise and destruction of its business. Yet the court now holds that the plaintiff is remediless. Insofar as the scheme was successful, it resulted in contracts between the defendant and its other dealers to which the plaintiff was a stranger and as a result of which he was not affected. When in the plaintiff's case the plan failed for the reason that he refused to become a party to the violation of the law, the plaintiff cannot recover because the scheme was concocted under the cloak of immunity of a single corporate entity. At long last a method has been found to flout the purposes of the antitrust laws and to deny the victims any recourse to the courts. I cannot agree.

The majority would apparently have no trouble with the case if it involved two corporate entities; for example, if one corporation manufactured the equipment and a subsidiary or separate corporation attended to its sales and distribution. Cf. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598, 606, 71 S.Ct. 971, 95 L.Ed. 1199, where Government counsel, I think, conceded too much. Certainly it is now well settled that "common ownership and control does not liberate corporations from the impact of the antitrust laws." Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L. Ed. 219; Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199.

It seems to me that whether the functions are performed by separate corporations or by a single entity is purely a matter of convenience to be exercised under state law and that the incidence and effect of the federal antitrust laws should be the same no matter what form the transactions take.

It is important, I think, to keep in mind that we are dealing with a law of such breadth as to be comparable to the constitution itself. As said by Chief Justice Hughes speaking for the court in Appalachian Coals, Inc., v. United States, 288 U.S.

344, 359, 360, 53 S.Ct. 471, 474, 77 L.Ed. 825:

> "As a charter of freedom, the act has a generality and adaptability comparable to that found to be desirable in constitutional provisions. It does not go into detailed definitions which might either work injury to legitimate enterprise or through particularization defeat its purposes by providing loopholes for escape."

Section 1 of the Act, 15 U.S.C.A. § 1, declares to be illegal *"every * * * conspiracy, in restraint of trade or commerce among the several States"*. (Emphasis supplied.) What Chief Justice White said in United States v. American Tobacco Co., 221 U.S. 106, 180, 181, 31 S.Ct. 632, 648, 55 L.Ed. 663, seems pertinent to the present case:

> "* * * all the difficulties suggested by the mere form in which the assailed transactions are clothed become of no moment. This follows because, although it was held in the Standard Oil Case [Standard Oil Co. of New Jersey v. U. S., 221 U.S. 1, 60, 31 S.Ct. 502, 55 L.Ed. 619] that, giving to the statute a reasonable construction, the words 'restraint of trade' did not embrace all those normal and usual contracts essential to individual freedom, and the right to make which was necessary in order that the course of trade might be free, yet, as a result of the reasonable construction which was affixed to the statute, it was pointed out that the generic designation of the 1st and 2d sections of the law, when taken together, embraced every conceivable act which could possibly come within the spirit or purpose of the prohibitions of the law, without regard to the garb in which such acts were clothed. That is to say, it was held that, in view of the general language of the statute and the public policy which it manifested, there was no possibility of frustrating that policy by resorting to any disguise or subterfuge of form, since resort to reason rendered it impossible to escape,

by any indirection, the prohibitions of the statute."

It is said, however, that "A manufacturer has the unquestioned right to refuse to deal with anyone for reasons sufficient to himself." The reason the defendant refused to deal with the plaintiff, as alleged in the complaint, was that the plaintiff refused to agree not to sell and distribute communication equipment manufactured by others in the territory of its franchise, a class of equipment which the defendant also refused to sell to the plaintiff. It seems to me that the defendant's refusal to deal with the plaintiff for that reason was illegal, so as a necessary consequence of the language of Mr. Justice Burton speaking for the court in the recent case of Lorain Journal Co. v. United States, 342 U.S. 143, 155, 72 S.Ct. 181, 187:

> "The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases. We do not dispute that general right. 'But the word "right" is one of the most deceptive of pitfalls; it so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified.' American Bank & Trust Co. v. Federal Bank, 256 U.S. 350, 358, 41 S.Ct. 499, 500, 65 L.Ed. 983. The right claimed by the publisher is neither absolute nor exempt from regulation. Its exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act. The operator of the radio station, equally with the publisher of the newspaper, is entitled to the protection of that Act. *'In the absence of any purpose to create or maintain a monopoly,* the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal'. (Emphasis supplied.) United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992. See Associated Press v. United States, 326 U.S. 1,

918

15, 65 S.Ct. 1416, 1422, 89 L.Ed. 2013; United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 721–723, 64 S.Ct. 805, 812, 813, 88 L.Ed. 1024."

My brothers use such strong adjectives as "unique" and "absurd" in referring to the contention of a conspiracy to which only the corporation and its own officers and agents are parties. That thought did not occur to Mr. Justice Burton when he included in the statement of the Lorain Journal Case, supra, the following:

> "The complaint alleged that the corporation, together with four of its officials, was engaging in a combination and conspiracy in restraint of interstate commerce in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C.A. § 1, and in a combination and conspiracy to monopolize such commerce in violation of § 2 of the Act, as well as attempting to monopolize such commerce in violation of § 2." 342 U.S. 143, 145, 72 S.Ct. 182.

See also Emich Motors Corp. v. General Motors Corp., 7 Cir., 181 F.2d 70, reversed on another point, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534; United States v. General Motors Corp., 7 Cir., 121 F.2d 376; Patterson v. United States, 6 Cir., 222 F. 599; White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 129 F.2d 600.

In short, I think if we apply to the amended complaint the rule of reason rather than the rule of form, it is entirely sufficient. I, therefore, respectfully dissent.