**ARIATE COMPANIA NAVIERA, S.A., as Owner of the SS ARION, Plaintiff,**

v.

**COMMONWEALTH TANKSHIP OWNERS, LTD., Republic Shipping Co., Holly Products Co., Inc., Lincoln Chartering & Shipping Corp., Westward Shipping, Limited, Tokyo Shipping Co., Ltd., Mertsco of Canada, Limited, Stanley R. Ketcham, A. T. Philpotts, Jr., and Donald E. Woodworth, Defendants.**

**No. 62 AD 543.**

United States District Court,
S. D. New York.

Feb. 27, 1970.

Joseph Cardillo, Jr., New York City, for plaintiff.

Richard Steel, New York City, for defendants Lincoln Chartering & Shipping Corp. and A. T. Philpotts, Jr.

Foley & Martin, by Christopher E. Heckman, New York City, for defendants Holly Products Co., Inc. and Donald E. Woodworth.

CANNELLA, District Judge.

This is an action for breach of a time charter party [1] which the plaintiff ostensibly entered into on February 2, 1962 with Commonwealth Tankship Owners, Ltd. [hereinafter "Commonwealth"],

which then subchartered [2] on the same date to Republic Shipping Company [hereinafter "Republic"]. Defendant Lincoln Chartering and Shipping Corporation [hereinafter "Lincoln"] purported to act as agent for Commonwealth in both transactions as well as for Republic, with defendant Alvin T. Philpotts, Jr., Lincoln's president and "attorney-in-fact", signing both times on behalf of Commonwealth and Lincoln "operations manager" Colucci signing on behalf of Republic. In addition to the breach, the plaintiff alleges conspiracy to defraud it of its charter hire on the part of Lincoln and Philpotts and defendants Holly Products Co., Inc. [hereinafter "Holly"] and Donald E. Woodworth, the only four defendants of those named in the caption presently before the court. The court has determined that judgment shall be entered on behalf of the plaintiff against Philpotts, but not against Lincoln, Holly and Woodworth.

Plaintiff's S.S. Arion was chartered for a period of "five (5) to about eight (8) months," with the monthly rate of hire set at $2.00 per ton on the total dead weight capacity of the vessel, which was agreed to be 10,880 long tons. The hire was payable in cash in New York, semi-monthly in advance, commencing on and from the day of delivery of the ship, which turned out to be February 23, 1962. On that date, the Arion began lifting a general cargo at Yokohama, whereupon a dispute arose between the master and Republic's agent in Japan, Tokyo Shipping Co., Ltd. [hereinafter "Tokyo Shipping"], over the wording of the bills of lading. Relying on clause 18 of the governing charter party which provides that the (plaintiff)-owner "shall have a lien upon all cargoes, and all sub-freights for any amounts due under" the charter party, the master refused to sign the various bills of lading on the ground that none of them provided for this lien, either directly or by reference.[3] This

1. Plaintiff's Exhibit 1.

2. See defendant Philpotts's Exhibit A.

3. The master also refused to sign certain "clean" bills of lading on the ground that the particular cargo was damaged.

dispute followed the Arion around the coast of Japan to Kobe and then across the Pacific to New Westminster (Vancouver) [4] where additional cargoes destined for various North and Central American ports were lifted. It is clear, and the court so finds, that the disputed bills of lading were signed, but that the master did not sign any of them, nor did he authorize anyone else to do so. What is not clear is (1) who specifically authorized the signings and (2) who actually signed all the bills. Only two such documents of title were introduced in evidence: Plaintiff's Exhibit 2 was signed by Tokyo Shipping's agent in Kobe; plaintiff's Exhibit 3 was stamped by Westward Shipping Limited, charterer's agent in Vancouver.

In accordance with the charter party, the first semimonthly hire payment of $10,880 fell due on February 23, 1962. However, this amount was not paid to the plaintiff until March 1, 1962. The second and third payments, which were due on March 9th and March 24th, were not paid until March 14 and 28 respectively. No further such payments were received by the plaintiff, which then filed its libel in this court on May 21, 1962.

The issues set forth in the Pre-Trial Order for determination by the court are: (1) Was there a breach of the charter party, dated February 2, 1962, by Commonwealth? (2) Did Holly, Lincoln, Philpotts and Woodworth, individually and/or in consort, and/or with others, conspire herein to defraud the [plaintiff] of the charter hire due and owing to [it] by virtue of the charter party between [plaintiff] and Commonwealth? (3) Are Holly, Lincoln, Philpotts and Woodworth, individually, or any of them, liable to the [plaintiff] herein for damages and if so, who is liable and in what amount?

■ With regard to the first issue, the answer is clear-cut. The court finds that there was a breach of the charter party entered into on February 2, 1962. Indeed, the four defendants before the court do not argue otherwise.[5]

■ However, the defendants do argue that this court does not have admiralty jurisdiction [6] over them. But Judge Feinberg overruled precisely this exception in a memorandum dated August 29, 1962, wherein he referred to Archawski v. Hanioti, 350 U.S. 532, 76 S.Ct. 617, 100 L.Ed. 676 (1956). In that case, the Supreme Court held that allegations of wrongfulness and fraud did not alter the essential character of the libel and thereby divest this District Court of admiralty jurisdiction. See 350 U.S. at 534, 76 S.Ct. 617. The cause of action was found to be essentially one for breach of a maritime contract,[7] which is also the essence of the case at bar.[8] The plaintiff here would have no cause of action at all were it not for the fact that the charter party was breached. The court therefore reiterates, in effect, the ruling of Judge Feinberg by finding that plaintiff has set forth a cause of action within admiralty jurisdiction.[9]

4. The Arion sailed from Yokohama on February 26, 1962 and arrived in Kobe on February 28th. She departed Kobe on March 15, 1962 and arrived in New Westminster on or about April 2, 1962, leaving there several days later.

5. See Post-Trial Memorandum on Behalf of Defendants, Lincoln Chartering & Shipping Corp. and A. T. Philpotts, Jr. [hereinafter "Lincoln Brief"], p. 7; Post-Trial Brief for Defendants, Holly Products Co., Inc. and Donald E. Woodworth, p. 4.

6. 28 U.S.C. § 1333(1).

7. See 350 U.S. at 533, 76 S.Ct. 617.

8. Plaintiff's alleging a breach of the charter party is hardly "the incidental inclusion" claimed by defendants Holly and Woodworth. See Post-Trial Brief for Defendants, Holly Products Co., Inc. and Donald E. Woodworth [re] Admiralty Jurisdiction [hereinafter "Holly Jurisdiction Brief"], p. 12.

9. Defendants Holly and Woodworth argue that the court would have jurisdiction over this action on the civil side under

■ This court, as previously noted, only has jurisdiction over four of the named defendants, and neither Commonwealth nor Republic are presently before the court. The reason for the concession on the part of the four defendants regarding the first issue is therefore obvious. What is also obvious to the court, however, is that Commonwealth was of scarcely more substance than a corporate name registered in the Bahamas, and that it was purely a phantom in regard to the charter party, with no real stake in the venture.[10] While it may be true that it is common practice for charter parties to be arranged by shipping agents (witness, for example, plaintiff's reliance on an agent in this case [11]), the court finds that when Lincoln signed the charter party, the terms of which it, and not Commonwealth, had negotiated,[12] it did so not as an agent, but rather as a principal. "One corporation may * * * become an actor in a given transaction, or in part of a business, or in a whole business, and, when it has, will be legally responsible. To become so it must take immediate direction of the transaction through its officers, by whom alone it can act at all." [13] It is clear that responsibility for performance of charterer's obligations under the charter party rested from the beginning with Lincoln, which had the only real financial stake in the transaction. It was Lincoln, as represented by Philpotts, who approached Holly president Woodworth regarding a loan to cover the costs involved in the charter party: payment of the hire, fuel costs, port charges, stevedoring, insurance, etc. Holly was characterized by Woodworth as "primarily a holding company for investments" which advanced Lincoln money against which Holly took assignments of the "Arion" freights as collateral, with the freights to be paid directly to Holly by the (shippers') agent(s).[14] Lincoln gave Holly notes as evidence of the indebtedness.[15] Defend-

28 U.S.C. § 1332 and that the action should therefore be transferred. See Holly Jurisdiction Brief. pp. 13–14.

Defendants Lincoln and Philpotts, while joining their two codefendants in challenging the court's admiralty jurisdiction, argue that although the court may have jurisdiction on the civil side, it should dismiss the present action and require the plaintiff to start anew. See Lincoln Brief, p. 8.

10. Republic, to which Commonwealth had immediately subcharted, also appears to have had little, if any, direct involvement of substance in the transaction. Defendant Philpotts testified that Republic subsequently was in default under the subcharter, but that Commonwealth did not take any action therefor, nor did it contemplate doing so in the future.

11. Tharros Shipping Co., Ltd.

12. Lincoln also "negotiated" the subcharter with Republic.

13. Kingston Dry Dock Co. v. Lake Champlain Transportation Co., 31 F.2d 265, 267 (2d Cir. 1929). This court, while recognizing that Judge Hand makes this point in the context of control of a sub-sidiary by a parent corporation, finds the basic rationale that the actions of an agent corporation can confer on it responsibility as a principal in a given transaction apposite here.

14. Lincoln remained in contact with Tokyo Shipping throughout the loading in Japan, and it was Lincoln which assigned the "Arion" freights to Holly. See plaintiff's Exhibits 27 and 28.

15. Plaintiff's Exhibit 26 lists notes totalling $76,750 and dated Feb. 23 and 26 and March 2, 13 and 27, [1962]. On the first three dates, sums totalling $49,-000.15 were disbursed directly to Lincoln by Holly. On the latter two dates, Holly paid the plaintiff-owner directly a total of $25,360, apparently to cover at least two of the charter hire payments due. Cf. Pre-Trial Order, p. 4. Some $67,250 of the amount loaned by Holly had first been loaned to it by the Irving Trust Company. The bank made four demand loans to Holly, one each on Feb. 23 and 27 and two on March 27, 1962. These loans were secured by five Lincoln notes and some $38,000 in marketable securities of Holly.

Exhibit 26 lists total actual disbursements on the part of Holly of $74,350.15

ant Woodworth testified that he knew nothing about Commonwealth when Philpotts approached him, just Lincoln, and that Holly was looking only to Lincoln for repayment of the loans.

In addition to finding that Lincoln was the corporate principal herein, the court finds that the charter party was essentially the contrivance of Philpotts, who apparently involved himself in a number of corporations of little substance[16] At the time of the signing of the charter party, he wore simultaneously the hats of president and director of Commonwealth, Lincoln and Republic and owned fifty percent of the stock of Lincoln. He did not own stock in either Commonwealth or Republic. However, he testified that he was also the president and a director in Mertsco of Canada, Ltd., and that, at one time, he had owned the controlling interest in that corporation. Mertsco owned stock in Republic.

■■ It is clear that a business can be incorporated for the very purpose of avoiding personal liability. See, e. g., Bartle v. Home Owners Cooperative, 309 N.Y. 103, 106, 127 N.E.2d 832, 833 (1955); African Metals Corporation v̄. Bullowa, 288 N.Y. 78, 86, 41 N.E.2d 466, 470, reargument denied, 288 N.Y. 673, 43 N.E.2d 75 (1942); Natelson v. A.B.L. Holding Co., Inc., 260 N.Y. 233, 238, 183 N.E. 373, 374 (1932). Furthermore, "an officer or director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract,

merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken." Application of Brookside Mills, 276 App. Div. 357, 367, 94 N.Y.S.2d 509, 518 (1950); Potter v. Minskoff, 2 A.D.2d 513, 514, 156 N.Y.S.2d 872, 873 (1956), aff'd, 4 N.Y.2d 695, 171 N.Y.S.2d 88, 148 N.E.2d 303 (1958). On the other hand, "[i]t is well settled that courts will not be blinded by corporate forms nor permit them to be used to defeat public convenience, justify wrong or perpetrate fraud, but will look through the forms and behind the corporate entities involved to deal with the situation as justice may require." Stone v. Eacho, 127 F.2d 284, 288 (4th Cir.), cert. denied, 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942). In looking through the forms and behind the corporate entities in this case, the court finds Philpotts endeavoring "to put together transactions that could possibly make money" while shielding himself with corporations (see Appendix A) with minimal capitalization,[17] the existence of which often depended on the success or failure of one such transaction. Lincoln, for one, appears to have been nothing more than the alter ego of Philpotts, and the court therefore finds that justice requires here that the Lincoln corporate veil be pierced and that Philpotts be held personally liable for the breach of the charter party. Cf. Archawski v. Hanioti, 129 F.Supp. 410 (S.D.N.Y.1955).

■ Turning to the second issue above, the Appellate Division of the New

[sic], the difference between this sum and the notes' total being attributed to certain fees and interest charges, and the exhibit further lists transfers on the part of T[okyo] S[hipping] to Holly in the amounts of $10,703.35 and $36,470 on March 6 and 26, [1962] respectively and a transfer of $23,895.30 on April 9 from the Vancouver [Weight Mark Company, Ltd.] to Holly. Total amount transferred to Holly: $71,068.65.

16. Commonwealth and Lincoln, for example, were apparently so frail that both

went out of business shortly after the failure of the transaction contemplated in the charter party.

17. Lincoln, for example, was apparently capitalized for only $5,000. "The rule that inadequate capitalization can serve as a basis for disregarding the corporate entity has been gaining support in the decisions." Mull v. Colt Co., Inc., 31 F.R.D. 154, 163 (S.D.N.Y.1962).

York Supreme Court has summarized the law of civil conspiracy as follows:

"The allegation of a civil conspiracy, without more, does not in and of itself give rise to a cause of action. The actionable wrong lies in the commission of a tortious act, or a legal one by wrongful means, but never upon the agreement to commit the prohibited act standing alone." * * * An overt act must be pleaded. * * * "The gravamen of a conspiracy is fraud and damage and not the conspiracy. The allegation and proof of a conspiracy are only important to connect a defendant with the acts and declarations of his co-conspirators, where otherwise he could not have been implicated. * * * A conspiracy to commit an actionable wrong is not in itself a cause of action." * * * "For the purpose of imposing civil liability, the law takes no cognizance of a conspiracy confined to a state of mind or to an inoperative understanding." [18] (citations omitted)

However, one contracting party does not have a cause of action against the other for conspiring to breach the contract or for inducing the breach. Cuker Industries, Inc. v. William L. Crow Construction Co., 6 A.D.2d 415, 417, 178 N.Y.S.2d 777, 779 (1958); Nolan v. Williamson Music, Inc., 300 F.Supp. 1311, 1320 (S.D.N.Y.1969). "[D]efendant parties to [a] contract are not liable in tort; their liability is solely for breach of the contract." Warner Bros. Pictures, Inc. v. Simon, 21 A.D.2d 863, 251 N.Y.S. 2d 70, 71 (1964), aff'd, 15 N.Y.2d 836, 257 N.Y.S.2d 947, 205 N.E.2d 869 (1965). Thus, in view of the court's finding that Lincoln and Philpotts were the real parties to the charter party, the plaintiff has no cause of action against them for conspiracy. Furthermore, while it is possible for an individual to conspire with a corporation, this is true only when that individual is not otherwise affiliated in an official capacity with the corporation. See Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911, 914 (5th Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); Bereswill v. Yablon, 6 N.Y.2d 301, 305, 189 N.Y.S.2d 661, 664, 160 N.E.2d 531, 533 (1959). In this case then, Lincoln could not have conspired with its president Philpotts, nor could Holly have conspired with its president Woodworth. Taken as single entities, however, Lincoln-Philpotts could have conspired with Holly-Woodworth and/or others to defraud plaintiff of its charter hire, but the court finds that the plaintiff has failed to prove any such conspiracy involving Holly-Woodworth and/or others.

The gist of the plaintiff's argument [19] is that it would have been "foolhardy in the extreme" [20] if Woodworth had dealt with Lincoln-Philpotts at arm's length in view of their financial situation and that the logical presumption is that he did not do so, but rather acted as a reasonably prudent businessman and took part with them in a joint venture. The plaintiff further argues that the making of the loan itself, the issuance of "false" bills of lading, and the subsequent assignments (by letters dated March 5 and 14, 1962 [21]) of the freights from Japan and Vancouver directly to Holly represented "overt acts" in furtherance of the conspiracy involving Holly and Woodworth. Plaintiff claims, in effect, that Commonwealth, that is to say, it—the plaintiff—was entitled to the freights.

Taking the alleged overt acts in the above sequence, the plaintiff does not seriously press its claim that the loan itself is evidence of a conspiracy to defraud.[22] With regard to the bills of

---

18. Corris v. White, 29 A.D.2d 470, 472–473, 289 N.Y.S.2d 371, 374 (1968).

19. See generally Post-Trial Memorandum in Support of Plaintiff [hereinafter "Plaintiff's Brief"], pp. 18–25.

20. Id., p. 19.

21. Plaintiff's Exhibits 27 and 28.

22. Plaintiff's Brief, p. 20.

lading, their lack of any reference to the charter party generally or to clause 18 thereof specifically and the prepayment of the freights served to discharge plaintiff's lien on the cargoes and sub-freights for the charter hire due. See generally W. Poor, American Law of Charter Parties and Ocean Bills of Lading § 16 (5th ed. 1968); Gilmore & Black, The Law of Admiralty § 4–17 (1957). Cf. Production Steel Company of Illinois, Inc. v. SS Francois L.D., 294 F.Supp. 200 (S.D.N.Y.1968). Even if the court were to assume that the bills of lading were signed under direct orders from Lincoln, it is not clear that this would constitute fraud. Clause 8 of the charter party reads, in pertinent part:

> \* \* \* The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and \* \* \* the Captain \* \* \* *is to sign* Bills of Lading for cargo *as presented*, in conformity with Mate's or Tally Clerk's receipts. (emphasis added)

In view of this wording, it is questionable whether the master had a right to reject the bills of lading for failure to incorporate a reference to the charter party. Wharton Poor makes the following point.

> Under the ordinary form of time charter, the master is to be under the charterer's orders as respects agency and other arrangements, and *this includes the right to require the master to sign bills of lading without incorporating the charter party therein.*[23] (emphasis added)

But regardless of whether the signing of the bills of lading by someone other than the master constituted fraud or not, the mere creation of a secured interest in a given transaction does not imply a conspiracy to defraud. Indeed, it would have been "foolhardy in the extreme" had Woodworth not sought security for the sizeable loan to Lincoln in view of that firm's flimsy financial situation. The fact that a loan is made in support of a transaction with a dubious financial outlook does not, without more, make the lender liable if the venture ultimately fails.

In summarizing this opinion, which represents the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court finds: (1) There was a breach of the charter party for which defendant Philpotts is liable. (2) The defendants Holly, Lincoln, Philpotts and Woodworth did not conspire among themselves or with others to defraud the plaintiff of the charter hire due and owing to it.

At the trial of this action, the plaintiff restricted its claim for damages to the charter hire due for five months, the minimum duration of the time charter party. This means that ten semimonthly payments in the amount of $10,880 each should have been made to the plaintiff. Only three such payments were actually made. Judgment shall therefore be entered on behalf of the plaintiff against defendant Philpotts in the amount of seven times $10,880 or $76,160, with interest calculated from the specific dates in 1962 when each of the seven payments first became due. Costs and disbursements of this action are awarded to the plaintiff as against defendant Philpotts.

Submit order.

---

23. Footnote omitted. W. Poor, American Law of Charter Parties and Ocean Bills of Lading 48–49 (5th ed. 1968).