John DeBONAVENTURA and Amelia De-Bonaventura, t/a John's Body Shop; James J. Henry, Frederick H. Henry and Robert J. Henry, t/a Henry Bros.; Jesse Giobbe, t/a Joe Giobbe and Son Auto Body Shop; Hobart E. Ramey, t/a Ray's Body Shop; Francis Lewandowski t/a Lewandowski's Auto Body; and Edward J. Henry and Son, Inc., a Delaware Corporation, Plaintiffs,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY, an Ohio Corporation, Defendant.

Court of Chancery of Delaware, New Castle County.

Submitted Feb. 15, 1980.

Decided June 18, 1980.

Supplemental Opinion July 30, 1980.

Alfred J. Lindh and Dennis Siebold, Jr., Wilmington, for plaintiffs.

Richard E. Poole, Daniel F. Lindley and Gregory A. Inskip of Potter, Anderson & Corroon, Wilmington and Richard C. Beifuss, Columbus, Ohio, for defendant.

MARVEL, Chancellor:

The amended complaint in this action filed by the owners of six[1] automobile body repair shops located in Wilmington, Newport and Newark, and doing business for the most part in northern Delaware, which shops claim to operate independently of each other and of any third party, alleges in a first cause of action that the defendant Nationwide Mutual Insurance Company, an insurer inter alia of material damage sustained by motor vehicles as a result of negligence covered by a contractual undertaking of such insurer, by means of the actions of its own employees or agents has allegedly made use of its position of control and leverage[2] as a national insurer of the risks involved in the operation of motor vehicles " * * * to coerce, intimidate or otherwise force members of the public who have claims against Nationwide[3] * * * for automobile repairs, to use automobile repair shops affiliated with, influenced or controlled by Nationwide * * * and to refrain from using plaintiffs' independent automobile repair shops", thus allegedly causing loss and damage to plaintiffs in an undetermined amount which plaintiffs will seek to recover in the event Nationwide's liability for its alleged coercive practices is established. Also sought is the granting of injunctive relief against the continuance of what the amended complaint claims is defendant's allegedly unlawful conduct of diverting or channeling automobile body repair work away from plaintiffs' shops to so-called "competitive" or "preferred" shops of defendant's choice, where, according to plaintiffs, through the use of allegedly inferior materials, such as used bumpers, which have been rechromed, as well as other used parts, by the employment of allegedly unskilled workers, and by improperly insisting on discounts for new replacement parts, ranging from 10% on metal to as much as 40% on glass, repairs to automobiles damaged as a result of highway accidents are made at less cost to defendant than would the purchase of equivalent but allegedly higher grade replacement parts, better material in general, as well as better workmanship, all of which are allegedly to be found at plaintiffs' shops.[4] Faced with the prospect of ever increasing policy premiums and client resistance to such increases, Nationwide's change of policy from one of having their insureds obtain estimates from one or more auto body repair shops of their choice to one of strongly urging such insureds to have their damaged automobiles repaired at competitive shops of Nationwide's choice, appearing to date back to 1968 or 1969, when with the direct encouragement or even insistence of high corporate officials of the defendant, the patronizing of " * * * the more competitive garages being more competitive in return for increased volume * * * " was laid down as a national policy for Nationwide's agents to follow.

A second cause of action alleges the existence of a conspiracy,[5] entered into between the defendant Nationwide and others, including other insurers, for the alleged purpose of depriving the general public of the right to make a free and fair choice of a body shop when the need should arise for

---

1. After the filing of this action the plaintiff Hobart E. Ramey, t/a Ray's Body Shop went out of business in 1974. Mr. Ramey, as of the time of trial, was employed by the plaintiffs, James J. Henry, Frederick H. Henry and Robert J. Henry, t/a Henry Bros.

2. In 1976, Nationwide allegedly had approximately 36,546 material damage policies in force and effect in New Castle County or an average of one policy per 3.5 households.

3. Also named as a party defendant at the inception of this action was International Underwriters, Inc., which party defendant was later dropped on plaintiffs' motion.

4. Defendant, on the other hand, describes its so-called "competitive" or "preferred" shops as places of business which do quality work promptly at competitive prices, which, while not necessarily the lowest in the area, are lower than the highest prices charged locally for automobile body repairs.

5. However, plaintiffs have failed to prosecute charges that the defendant Nationwide has engaged in a horizontal conspiracy with other insurers.

resorting to an automobile body repair facility, while a third cause of action complains of statements on the part of the defendant Nationwide allegedly designed to slander plaintiffs' established reputation in the community for honest dealing and the furnishing of quality materials and workmanship to its customers, statements which allegedly damage plaintiffs economically. And there would appear to be no doubt but that by and large plaintiffs, over the years up to now, have furnished quality workmanship and materials in the course of conducting their business of repairing damaged motor vehicles at a cost of somewhat more than is charged by defendant's so—called preferred shops.

Finally, a fourth cause of action complains that the business practices engaged in by Nationwide consisting of the alleged diversion of business away from plaintiffs' shops to shops of defendant's choice, conduct which is allegedly directed against plaintiffs' free and unrestricted management of their own business, constitutes a prima facie tort.

In summary, however, the several theories which plaintiffs advance in support of their purpose of establishing liability on defendant's part, other than the alleged liability which has been incurred as a result of claimed tortious interference with plaintiffs' businesses by means other than that of diverting its automobile repair business away from plaintiffs' shops [6] by use of so—called live—wire or direct reporting of damage and the obtaining of prompt appraisals at a so—called drive—in, coupled with virtual insistence on the part of defendant's agents that one of its preferred shops be used for the required repairs and channeling it to so—called competitive shops of its own choice, appear to have been either dismissed, abandoned, or included within the broad scope of action allegedly constituting the improper diversion or channeling of the business of making repairs to damaged au-

tomobiles of defendant's insureds as well as those of third party claimants who seek payment for their loss out of insurance moneys payable under the terms of defendant's policies, away from one of plaintiffs' generally more expensive shops, and the channeling of such repair moneys to one or more of the shops recommended by defendant as having competitive prices.

Defendant's answer denies those allegations of the amended complaint which associate it with any business activity other than activities which meet with judicial approval in a capitalist system of free enterprise, and in which a buyer of goods and services may properly seek to obtain the lowest price compatible with acceptable quality, and in a third affirmative defense alleges that plaintiffs' action is barred by the doctrine of unclean hands in that:

"* * * individually, collectively and as members of a corporation or association known as 'Associated Body Shops of Delaware, Incorporated' [7] they have conspired to fix prices for automobile body repair work and parts and to persuade or compel other owners of body shops to charge such prices, which actions have resulted in an unlawful restraint of trade, and have attempted to coerce defendant Nationwide and its assureds (persons owning motor vehicles which Nationwide is required to repair under the terms of its insurance contracts) to pay inflated prices for automobile body repairs and parts which have been fixed by their illegal collusive action."

In adducing factual data in support of such defense, defendant introduced at trial evidence of proposed price—fixing action discussed informally at meetings of members of plaintiffs' trade association and later implemented in the form of a wage scale for shop workers employed by such members, as well as the use of so—called complimentary estimates, which on occasion

---

6. Significantly, when an insured has insisted on going to a shop of his choice, it is made clear to him by Nationwide's agents that he will be obliged to pay for any excess cost of repairs over and above Nationwide's estimate.

7. This organization is now known as Automotive Service Councils of Delaware, Inc.

have been made up on the stationery of a friendly non–competing body shop and thereafter used to eliminate or reduce competitive bidding on repair estimates. Plaintiffs were also shown to have agreed in 1969 on the adoption of a separate "materials" charge based on 10% of labor costs. Also agreed on by a number of the plaintiffs were synchronized raises of labor costs in 1971 and 1973 as well as the assessment of a $2.00 fee for estimates of damage.

The validity of the basic theory advanced in support of plaintiffs' case is to be found in the answer to the question of whether or not " * * * Nationwide may channel or direct automobile owners with whom it deals to its preferred shops." (Mr. Lindh's argument after trial p. 3).

First of all, it is apparent after trial that plaintiffs have no basic objection to the operation of so–called drive–ins by defendant after the incurring of automobile damage has been reported by telephone to a Nationwide's claims office by a policyholder via Nationwide's centralized live–wire system at which drive–in damaged cars of its insureds as well as those belonging to third party claimants are examined and prompt estimates made by an agent of Nationwide, usually an adjuster, of the extent of the damage sustained by any such motor vehicle in a particular accident. And plaintiffs do not object to defendant's actions in making binding damage settlements with its insureds as well as with third party claimants " * * * based on Nationwide's independent judgment of what is the proper cost of repairing an automobile." (Mr. Lindh's argument after trial p. 8).

What plaintiffs do object to is the claim of the defendant, once it has made an estimate of the damage suffered by the motor vehicle of an insured or that of a third–party claimant, to the claimed right to direct or to channel such person away from the auto repair shop of his or her choice to an automobile repair shop of defendant's choice, which in many instances is one of defendant's preferred shops, plaintiffs arguing that defendant is no more entitled to the right to coerce a claimant into patronizing a repair shop of defendant's choice than a personal injury insurer would have to direct an injured insured or third–party claimant to a physician or·surgeon selected by the insurer. Thus, plaintiffs argue, by dictating the drawing up of its damage estimates so as to cause such estimates to reflect what it contends to be competitive prices, by insisting on discounts and on the purchase of used bumpers, which have been rechromed, or failing that, that rebates on new bumpers be paid, defendant's activities transcend the field of insurance adjustment in which it is authorized to act, namely the settlement of tort claims, and, to plaintiffs' alleged injury, has purported to dictate and continues to dictate as to how insurance moneys required to be advanced by it pursuant to contract are to be expended in repairs performed at so–called competitive body repair shops which defendant has selected from among those body shops which had agreed in "To Whom it May Concern" letters of early 1972, to accept estimates of damages made by a Nationwide adjuster as being the " * * * the proper cost of repairs without having seen the vehicle", special objection being made to Nationwide's practice of requiring that its so–called competitive automobile repair shops pay to Nationwide a 10% discount on all new metal replacement parts and substantially more on glass, plaintiffs characterizing such practices as being improper kick–backs. Also objected to by plaintiffs is defendant's practice of issuing drafts drawn to the joint order of the insured or claimant and a preferred or competitive repair shop so as to make certain that the cash paid out in settlement of a claim will not be paid to an automobile repair shop of the insured's or claimant's choice but to one of defendant's preferred or competitive shops.

Nationwide admits that it normally recommends to its insureds as well as to third party claimants that the repairs to be made on a damaged motor vehicle covered by an insurance policy issued by it be performed at a shop of its choice and that in effectuating settlements it issues joint drafts the effect of which is to require the policyholder or claimant to use the facilities of the

shop of defendant's choice, but contends that it is entitled to do so because of its self interest in settling claims at the lowest possible cost compatible with the furnishing of adequate materials and workmanship and that its actions in making such settlements stimulate rather than stifle competition.

The tort of interference with an existing contract and of interference with probable future contractual relationships are closely related. Each such tort is derived from the common law rule against restraints of trade, a rule based to a large extent on the economic consequences of such restraints. Such rule has its origins in the refusal of the common law courts of England to enforce restrictive covenants not to compete, *Dyer's Case*, Y.B.2 Henry V pl. 26 (1415), such principle being later applied to prevent interference with existing contracts, *Lumley v. Gye*, 2 El. & Bl. 216, 118 Eng.Rep. 749, 1 Eng.Rul.Cas. 706 (1853), and still later to interference with prospective contracts or business opportunities, *Temperton v. Russell*, 1 Q.B. 715, 62 L.J.Q.B. 412 (1893).

■ The elements of the two species of torts above outlined are similar but not identical, the principal distinction between them being the availability to the defendant of a privilege to interfere within the limits of fair competition with prospective business opportunities. Thus, while interference with an existing contract requires (a) an intent to induce a breach (b) of an existing contract, (c) proximate causation, and (d) damages; a showing of deliberate interference with a prospective business opportunity requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner, *Bowl–Mor Company, Inc. v. Brunswick Corp.*, Del.Ch., 297 A.2d 61 (1972), and *Regal Home Distributors, Inc. v. Gordon*, Del.Super., 66 A.2d 754 (1949).

The resolution of the fundamental dispute between the parties to this action is thus found in the answer to the question of whether or not Nationwide's activities are privileged because of its economic interest in settling claims as economically as possible. Nationwide contends that its economic interest and that of its insureds, which is allegedly found in the patronizing of the so-called competitive shops here in issue, protects it from attack as an interferor with plaintiffs' business opportunities and that its activities in this regard, in any event, encourage competition because they steer policyholders and claimants to the least expensive provider of competent repair services, thus encouraging price competition in the auto body repair industry.

Plaintiffs, however, contend that Nationwide's practices are not privileged because they are outside the legitimate boundaries of the business of insurance and constitute a common law restraint of trade or boycott and thus inject non-price elements into the auto body repair marketplace, disrupting rather than enhancing competition.

In the case of *Chick's Auto Body, et al. v. State Farm Mutual Automobile Insurance Company*, N.J.Super., 168 N.J.Super. 68, 401 A.2d 722 (1979) plaintiff body repair shops sought through the alleged application of the New Jersey anti-trust law in effect to decrease competition by seeking to obtain the entry of a court order compelling the defendant insurance companies to pay a higher rate for repair services than they paid to plaintiffs' competitors.

In denying such relief to the plaintiffs, the Court pointed out that no contention was made by the plaintiffs that any body shop willing to do the work at competitive prices had been excluded from a list of shops preferred by the insurance companies and stated:

"Plaintiffs do work for insureds of all of defendants; plaintiffs are free to do the work for the defendants' insureds at the estimates written by defendants or to turn the business away; plaintiffs are free to charge and collect from the defendants' insureds any part of the repair

price which exceeds the insurance reimbursement, and plaintiffs' allegation that they are 'denied' repair work is only that they have in certain instances declined jobs because defendant insurance companies estimate was below plaintiffs' and the insured did not wish to pay the difference out of his own pocket."

The recent economic struggle between so–called independent automobile body repair shops and the large insurers, such as Nationwide, has been waged, in the case of plaintiffs and Nationwide, over a period of almost fifteen years, commencing in the late 1960's when the pressure on Nationwide, exerted not only by its insureds but by the Insurance Commissioner of Delaware, to hold down spiraling insurance premiums, in turn forced Nationwide to abandon its former policy of acquiescence to and acceptance of the custom of having its insureds obtain two or more estimates of the cost to repair a damaged motor vehicle, settling usually on the lower or lowest estimate as the case might be and the adoption of the more aggressive policy of live–wire reporting and the obtaining of competitive repair estimates, made in most cases by an adjuster of Nationwide at its own drive–in.

Faced with the choice of being forced to accept Nationwide's own estimates of the amount of money reasonably required to restore a damaged motor vehicle to its pre–accident condition at a so–called competitive or preferred body shop or of paying out of his or her own pocket the additional amount needed to have such repairs made at a so–called independent body shop which has traditionally refused to use second hand parts regardless of their condition or to give discounts on new parts, it is obvious that many motorists have acceded to Nationwide's so–called coercion and permitted their damaged cars to be repaired at body shops which meet Nationwide's current price standards, leading to a possible loss of business on the part of plaintiffs. And I am satisfied after trial, despite the inadequacies of plaintiffs' principal exhibits on the subject, namely PXE–1, PXT–2 and PXU–6, together with the testimony of Dr. Tannian, all of which evidentiary matter

has to do with the alleged loss of business sustained by plaintiffs as the result of Nationwide's above recited change of business policy adopted in the late 1960's, that as a result of the use by defendant of the devices of the "To Whom it May Concern" letters, live–wire reporting, and the channeling of claims to competitive shops preferred by Nationwide, that plaintiffs have indeed suffered and will continue to suffer a loss of business as a result of such practices unless they are enjoined in whole or in part.

Plaintiffs' first reaction to the results of defendant's business strategy was to attempt to reason with the defendant and to try to persuade it to revert to its former policy of virtual non–interference with an insured's choice of a body shop which makes estimates essentially on a non–competitive basis. Failing in such effort, plaintiffs then turned to the Insurance Commissioner of the State of Delaware, who offered little if any sympathy or support to plaintiffs' complaint in light of his duty to maintain a reasonable level of insurance premiums. As a last resort in their efforts to obtain the restoration of what they considered to be their just prerogatives to bid successfully on the cost to repair damaged motor vehicles insured by the defendant, this action was filed.

Plaintiffs' basic contention in this case is that for the superficially beneficial purpose of minimizing automobile body repair costs and thereby allegedly preventing the increase of insurance premiums, defendant is violating statutory and common law principles which forbid price fixing, whether such prices are thereby increased, or, as here, decreased, *Group Life & Health Insurance Company v. Royal Drug Company*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261, rehearing denied, 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979), in which the Court stated:

"If agreements between an insurer and retail pharmacists are the 'business of insurance', because they reduce the insurer's costs, then so are all other agree-

ments insurers may make to keep their costs under control—whether with automobile body repair shops or landlords. Such agreements would be exempt from the antitrust laws if Congress had extended the coverage of the McCarran–Ferguson Act to the 'business of insurance companies.' But that is precisely what Congress did not do."

■ Plaintiffs concede that they made it clear to defendant's agent, Mr. Coates, in January, 1972 that they would not quietly accede to defendant's newly adopted way of doing business which includes the quoting of competitive prices and the giving of discounts on new parts, and rather than consenting to engage in such free competition later that year pursued a successful boycott against Quillen Brothers of New Castle, by refusing to buy new parts from such business firm because it granted discounts on new parts to be incorporated into its own body repair work until in January 1973 such firm agreed to discontinue the giving of such discounts. Thus, rather than seeking to compete in the market for business to be derived from the automobile body repair trade, plaintiffs have rather, by the use of boycott measures, by the making of loose but effective agreements with their fellow litigants and other body shop operators on hourly wages and the like, by the giving of complementary estimates and by refusing to use sound used parts in their body repair work or to give discounts on new parts, have priced themselves out of the northern Delaware body repair market, thus falling victims to a basic law of the free enterprise school of economics. As observed by the late Justice Holmes, while an appellate judge in Massachusetts: "One of the eternal conflicts out of which life is made up is that between the effort of every man to get the most he can for his services, and that of society * * * to get his services for the least possible return" *Vegelahn v. Guntner,* Mass.Supr., 167 Mass. 92, 44 N.E. 1077 (1896), or as recently stated in the case of *Chick's Auto Body, et al. v. State Farm, et al.,* supra:

"The second count alleges a 'boycott' on the part of defendants. Plaintiffs make

frequent use of the term 'leveraged shops.' As explained by one plaintiff, 'leveraged shops' are those included on each carrier's list[4] of those body shops that can be expected to perform repairs within the particular carriers estimate. There is no contention that anyone willing to work at competitive rates has been excluded from any list."

[4] "Such lists are expressly sanctioned by insurance regulations. N.J.A.C. 11:3–10:2(d)."

    \*    \*    \*    \*    \*    \*

"The claims adjustment activities of defendant insurance companies which are at the heart of this case are aimed at 'controlling the spiralling claims payment * * in the independent self–interest of each individual insurance company which adopted them.' *Proctor v. State Farm Mut. Auto. Ins. Co.,* supra [182 U.S.App.D.C. 264] at [561 F.2d 262] 276. The practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the marketplace (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition."

Furthermore, as stated in *Top Service Body Shop, Inc. v. Allstate Insurance Company,* Supr.Ct., Or., 283 Or. 201, 582 P.2d 1365 (1978) on defendant's motion for judgment notwithstanding verdicts and for a new trial in a case in which the plaintiff body shop claimed tortious interference on the part of the defendant insurance company with the former's business by directing insurance claimants to have their needed repair work done at body shops of defendant's choice:

"Taken most favorably to plaintiff, as is proper after a verdict for plaintiff, the evidence showed that Allstate has a practice of designating certain repair shops in the locality as 'competitive shops' to which it prefers to send insurance claimants for whose repairs Allstate is obligated; that Top Service at one time was a 'drive–in' shop for Allstate, where claimants would be directed for an estimate by an Allstate insurance adjuster; that after a dispute Top Service's owner decided that it would not continue as a drive–in shop for Allstate; and that thereafter Allstate adjusters would actively discour-

age claimants under its insurance policies from taking work to be paid for by Allstate to Top Service, sending them instead to other shops on its preferred list. As specific bases for an inference of destructive purpose, Top Service lists two occasions when Allstate adjusters disparaged the quality of Top Service's work (apart from its relative cost), although Allstate personnel had generally considered Top Service a high quality shop; Allstate's willingness to disappoint its own insured who preferred Top Service; one occasion when Allstate took its option to 'total' a car, i. e. to pay off its value, when the insured wanted it repaired at Top Service; and finally Allstate's resort to 'improper and unlawful means' to direct business away from Top Service to other shops. Without setting forth here the excerpts of the record cited by plaintiff, we agree with the trial court that these acts were wholly consistent with Allstate's pursuit of its own business purposes as it saw them and did not suffice to support an inference of the alleged improper purpose to injure Top Service. The court's ruling on this point was not error."

I conclude after trial that the crux of plaintiffs' grievance is to be found not in any contrived theory of improper economic coercion allegedly exercised against plaintiffs by defendant but in the economic reality that most car owners with valid claims against the present defendant have decided that the quality of the workmanship and materials available at plaintiffs' shops is not sufficiently superior to that furnished at the competitive or preferred shops recommended by defendant to its insureds and claimants to warrant the paying of money out of one's own pocket to make up the difference between plaintiffs' prices and those offered by those shops which quote more competitive prices without, generally speaking (with the possible exception of Mr. Sparco) furnishing the higher quality of workmanship and materials found at plaintiffs' shops. And it is generally recognized that in cases involving insurance coverage, an insurer may recommend that car repairs be made at body shops which do quality work at competitive prices. Compare *Sentinel Insurance Co. v. Anderson*, Tex.Civ. App., 196 S.W.2d 649 (1946).

Next, turning to the instances of individual car owners being allegedly directed to a preferred or competitive shop when it was clear that such owner's first choice was actually one of the plaintiffs' shops or an equivalent in possession of the first class body shop equipment owned by most of the plaintiffs and required in many cases for properly straightening, or, in many cases, replacing bent car frames, applying enamel paint and then baking it properly, plaintiffs were able to introduce testimony on the claims of only nine persons who actually sought damages from Nationwide for alleged improper diversion of their repair work from one of plaintiffs' shops to one of defendant's choice followed by the improper repair of their damaged motor vehicles. All of the claims appear to have been compromised in the long run. Thus, even in the extreme case of a Mr. Ammon, whose car was initially improperly repaired at Kirkwood Dodge, a shop to which Mr. Ammon was directed by Nationwide, the latter ultimately paid Henry Bros. to replace the frame of the badly damaged and initially badly repaired car. This same concern for the safety of damaged cars covered by its insurance policies appears to have been expressed by Nationwide in the cases of those other claimants who would have preferred to have had their cars' repair work initially to have been done by one of the plaintiffs and, who, at first, dissatisfied with the repair work performed by a body shop other than one of plaintiffs, ultimately were satisfied by the end result of the needed repairs whether done by a so–called competitive shop of defendant's choice or by one of the several plaintiffs. In short, even in those instances in which an insured car owner was persuaded to have needed repairs done at a shop of defendant's choosing, some compromise, concession, or explanation of the increased costs to be incurred at one of plaintiffs' shops due to their negative attitude towards discounts and used

parts or the authorization of needed additional work by one of plaintiffs appear to have solved the most urgent problem in what appears to have been on the whole successful efforts to satisfy the insured that the best possible solution had been found to his or her car damage problem. For instance, in the case of Mrs. Bessie Armour in which the adjuster's estimate was damage of approximately $450, as contrasted with the John's Body Shop estimate of $1,200, the latter ultimately agreed to make the required repairs for the amount of the estimate made by defendant's adjuster.

■ Finally, although one cannot help but be sympathetic with plaintiffs' efforts to preserve as their own domain the field of high grade repair of damaged motor vehicles covered by insurance policies issued by defendant, a domain in which for many years they appear to have performed exemplary if relatively expensive work, however, as in any area of business, the basic economic principles alluded to earlier in this opinion must ultimately prevail, and while plaintiffs' right to earn a fair return on their capital investment is clear, viewed in light of the rights of the insureds and the insurer, equally as valid is the right of the insured to have his or her car restored to the condition it was in prior to an accident at no additional cost other than the deductible part of his or her coverage as well as the right of the insurer to have needed repairs adequately accomplished for the least possible cost.

■ The answer to the question of whether or not to grant or refuse injunctive relief is often found in the practical aspects of a situation such as that presented in the litigation at hand. In the case at bar, the contracting parties, insofar as rights arising out of the issuance of insurance policies here in issue are concerned, are the insureds on the one hand and Nationwide on the other. If an insured or claimant in the course of the settlement of any damage claim covered by insurance issued by Nationwide is satisfied with the latter's estimate of the amount of the reasonable cost to repair a damaged vehicle and thereafter accepts Nationwide's choice of a repair shop to perform such needed repairs, there would appear to be no basis for granting plaintiffs the type of permanent injunctive relief which they pray for here, plaintiffs' grievance being attributable to the simple fact that their prices, are too high and non-competitive to enable them to bid successfully for the work involved in repairing damaged motor vehicles insured by Nationwide. Under the circumstances here presented there is clearly no sound basis in law for granting plaintiffs the permanent injunctive relief which they seek, namely the enjoining by permanent order of the settlement of damage claims asserted against Nationwide by its insureds at the lowest possible price compatible with road safety and the reasonable requirements of an insured or claimant. In other words, to require Nationwide to increase its appraisals of damage sustained by motor vehicles covered by its policies merely so that plaintiffs can bid successfully on such repairs would violate the basic principles of the free enterprise system. I accordingly conclude that judgment must be entered for the defendant.

Because of the conclusions here reached, it will be unnecessary to consider defendant's defense of unclean hands based on plaintiffs' alleged price fixing activities, including the giving of complementary estimates and the use of illegal boycotts.

On notice a form of order may be presented granting judgment for defendant.

### Supplemental Opinion

■ On July 3, 1980, on the assumption that plaintiffs had no objection to the form of order submitted by defendant for entry in this case in conformity with the opinion of the Court filed herein after final hearing on June 18, 1980, such order was duly entered. Such order, inter alia, reserved for future consideration defendant's motion for entitlement to reasonable expenses, including attorney's fees, incurred by it as a result of allegedly being required to prove the truth of matters which plaintiffs should have allegedly admitted in response to de-

fendant's requests for admissions filed under Rule 36.

Rule 37(c) provides that where a party fails to admit the genuineness of any document or the truth of any matter, and such is later established by the adverse party, the Court shall make such allowances, as prayed for,

"* * * unless it finds that (1) the request was held objectionable pursuant to Rule 36(a), or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that he might prevail on the matter, or (4) there was other good reason for the failure to admit."

Having considered opposing contentions of counsel, I conclude that certain plaintiffs' refusal to admit to their charging generally higher prices for auto body repair work, to their making of materials charges, to their synchronized increases in labor charges, to their concerted adoption of estimate charges, to their use of complementary estimates, as well as to their knowledge about Nationwide's claims practices, required Nationwide to prove all such matters. I further conclude that such matters were material to defendant's defense of this action.

I have therefore determined that defendant is entitled to its reasonable expenses incurred by being required to establish what plaintiffs should have reasonably conceded to be true. Plaintiffs will be held liable for such expenses, and jurisdiction to determine the amount of such expenses will be reserved pending further proceedings in this case.

In the meantime, the order of July 3, 1980 will remain of record as entered.