# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| GLOBAL DISCOVERY<br>BIOSCIENCES CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>DOUGLAS S. HARRINGTON, THE<br>ARK PARTNER LLC, SMART<br>HEALTH DIAGNOSTICS COMPANY<br>F/K/A PREDICTIVE HEALTH<br>DIAGNOSTICS COMPANY,<br>MATTHEW NUÑEZ, DANIEL<br>ANGRESS, and VISIONARY<br>PRIVATE EQUITY GROUP,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 2022-1132-SG |

## MEMORANDUM OPINION

Date Submitted:  August 23, 2023
Date Decided:  December 1, 2023

Stephen C. Norman, David A. Seal, Callan R. Jackson, and Charles R. Hallinan, POTTER ANDERSON, Wilmington, Delaware; OF COUNSEL: Eric Landau and Travis Biffar, ELLENOFF GROSSMAN & SCHOLE LLP, Irvine, California, *Attorneys for Plaintiff Global Discovery Biosciences Corporation*.

Andrew L. Cole and Jack M. Dougherty, COLE SCHOTZ P.C., Wilmington, Delaware, *Attorneys for Defendant ARK Partner LLC*.

Alan D. Albert, O'HAGAN MEYER, PLLC, Wilmington, Delaware, *Attorney for Defendants Douglas S. Harrington, Smart Health Diagnostics Company (f/k/a Predictive Health Diagnostics Company), and Matthew Nuñez.*

**GLASSCOCK, Vice Chancellor**

This matter alleges a rather breathtaking scheme to loot a Delaware entity. According to the pleadings, Defendant Dr. Douglas Harrington founded Global Discovery Biosciences with the financial backing of Dr. Khalid bin Jabor Al Thani ("Dr. Khalid"). The purpose of the company was to monetize a testing procedure, the PULS, which could identify early heart disease in patients. Briefly, a dispute arose between Dr. Harrington, and entities and individuals associated with him, on the one hand, and Dr. Khalid and his allies, as to who owned the controlling interest in Global. When it became clear that the Harrington parties were going to lose that battle, Dr. Harrington used his control of Global to transfer assets, including the PULS technology and other assets and funds, to other entities within Dr. Harrington's control. He then caused Global to declare bankruptcy. The Khalid faction, who in fact held the majority of Global equity, has assumed control of Global, and had the bankruptcy petition discharged. Global now seeks to hold Dr. Harrington and the other Defendants liable for theft of the PULS technology under the Delaware Uniform Trade Secrets Act, and alleges a host of equitable and common law torts against the Defendants as well, notably including breach of fiduciary duty and conversion against Harrington.

Before me is a partial motion to dismiss. The Defendants have moved to dismiss causes of action in the complaint, generally, on two theories—that individual causes of action, including under DUTSA, fail to state a claim; and that (assuming

1

the DUTSA claim survives) that DUTSA preempts all or part of the remaining common law claims. Following oral argument on the motion to dismiss, I found that the DUTSA claim was sufficiently pled, and that the partial preemption argument must be denied without prejudice, with respect to Counts I, II, V, and VI.[1] I also asked for, and received, supplemental briefing on whether the decisions of the bankruptcy court should collaterally estop a count in the Complaint alleging the Harrington and another Global fiduciary had breached fiduciary duties by placing Global in bankruptcy.

What follows is my decision on the balance of the Motion to Dismiss.

## I. BACKGROUND[2]

*A. Factual Background*

### 1. The Parties

Plaintiff Global Discovery Biosciences Corporation ("Global" or the "Company") is a Delaware corporation and is a private biotechnology and medical testing company, which was established in 2014 to develop and commercialize the PULS Cardiac Test (the "PULS").[3]

---

[1] Count I: Breach of Fiduciary Duty of Loyalty, Count II: Aiding and Abetting Breach of Fiduciary Duty, Count V: Conversion, and Count VI: Unjust Enrichment.
[2] This memorandum opinion contains a brief recitation of facts and includes only those necessary to my analysis.
[3] Am. Verified Compl. ¶ 5, Dkt. No. 28. ("Compl.")

Defendant Dr. Harrington founded Global and previously served as the chairman of its board of directors and President and CEO of the Company.[4]

Defendant The Ark Partner LLC ("ARK") is a Delaware limited liability company owned and controlled by Dr. Harrington.[5]

Defendant Smart Health Diagnostics Company ("Smart Health" or "Predictive Health"), formerly known as Predictive Health, is a Delaware corporation.[6] It is also controlled by Harrington.

Defendant Matthew Nuñez is a former Global CEO and currently serves as the CEO of Smart Health, which is a position he held while serving as Global's CEO.[7]

Defendant Daniel Angress is a former director and CEO of Global.[8]

Defendant Visionary Private Equity Group ("VPEG") is believed to be a Missouri limited partnership.[9]

Non-party Dr. Khalid bin Jabor Al Thani is an investor and stockholder of Global.[10]

---

[4] *Id.* ¶ 6.
[5] *Id.* ¶ 7.
[6] *Id.* ¶¶ 8, 70.
[7] *Id.* ¶ 9.
[8] *Id.* ¶ 10.
[9] *Id.* ¶ 11.
[10] *Id.* ¶ 12.

Non-party Trivalley Trading & Contracting WLL ("Trivalley") is Khalid's investment company, which Khalid used to invest in Global.[11] Trivalley is also a stockholder of Global.[12]

Non-party Estrella Harrington, now deceased, was Harrington's wife and former director of Global.[13]

Non-party Munira Al-Delemi was a former director of Global.[14]

### 2. Global's Formation and Harrington's Representations Regarding Global's Assets

In April 2014, Khalid, through his investment company, Trivalley, provided the seed investment in Global after being pitched by Harrington, which resulted in Global's formation.[15] Khalid's capital was used to commercialize Global's product, the PULS.[16]

After Khalid's investment, Harrington began to make representations to investors, the public, and third parties that Global was the creator and sole owner of the PULS; these representations spanned a period from 2014 to 2016.[17]

---

[11] *Id.*
[12] *Id.*
[13] *Id.* ¶¶ 27, 33.
[14] *Id.* ¶ 48.
[15] *Id.* ¶ 12.
[16] *Id.*
[17] *Id.* ¶¶ 13–19.

### 3. Dr. Harrington Disputes Khalid's Stock Ownership

On September 21, 2016, Khalid and Trivalley sent Global a letter requesting to inspect Global's books and records, after Khalid's questions concerning Global's state of business affairs had gone unanswered.[18] Harrington directed Global to deny the request, asserting that Khalid and Trivalley were never stockholders of Global.[19] After denying the inspection demand, Harrington caused Global to file a lawsuit in California challenging Khalid's and Trivalley's stock ownership.[20]

In that action, the California court ruled that Harrington's challenge to Khalid's and Trivalley's stock ownership was meritless, finding that Khalid and Trivalley were entitled to a 55% ownership interest in the total number of shares of Global.[21] Consequently, Khalid and Trivalley moved for summary adjudication.[22] On March 11, 2021, however, before the matter was decided, Global's counsel informed the court and opposing counsel that Global had filed for bankruptcy.[23] As a result, the hearing was vacated, and the court in the California litigation entered a stay of proceedings pending the bankruptcy.[24]

---

[18] *Id.* ¶ 19.

[19] *Id.*

[20] *Id.* ¶ 20; *Global Discovery Biosciences Corp. v. Khalid bin Jabor Al Thani, et al.*, No. 30-2016-00878822-CU-BC-WJC (Cal. Super. Ct. Nov. 18, 2019) ("Cal. Litigation").

[21] Compl. ¶ 21; Cal. Litigation.

[22] *Id.* ¶ 22.

[23] *Id.* ¶ 23.

[24] *Id.*

### 4. Dr. Harrington Forms Smart Health and Transfers Global's Assets

Thereafter, Harrington formed Predictive Health—now Smart Health—on November 22, 2016.[25] Harrington was and is Predictive Health's founder and controlling stockholder, and serves as its chairman.[26] After forming Predictive Health, Harrington transferred Global's assets and intellectual property, which included the PULS, the laboratory Global operated from, its laboratory equipment, and its laboratory personnel to Predictive Health.[27]

Further, Harrington caused Global to enter one-sided contracts with Predictive Health that diverted all of Global's revenue to Predictive Health.[28] In addition, Harrington attempted to convert Global into a licensee of Predictive Health.[29] Specifically, Global entered into a license agreement for the PULS with Predictive Health that would renew every year and require Global to pay Predictive Health a yearly license fee of $25,000, plus $25 per Cardiac PULS Test result.[30] Thereafter, Dr. Harrington rebranded PULS as the Predictive Health Diagnostics PULS Cardiac Test.[31]

---

[25] *Id.* ¶ 24.
[26] *Id.*
[27] *Id.* ¶ 25. That is, the former Global employees became Predictive Health employees. In addition, Smart Health uses the same business address as Global. *Id.* ¶ 24.
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.* ¶ 26.

All of Global's internal decisions were made by Harrington and his wife, Estrella Harrington, who held two out of three board seats on Global's board.[32] The two made numerous corporate decisions without observing corporate formalities.[33]

Around August 2017, Harrington accepted an investment from VPEG, which appeared to involve the purchase of a controlling interest in Predictive Health, as VPEG publicly describes Smart Health f/k/a Predictive Health as one of its portfolio companies.[34] This transaction was not made known to Global stockholders.[35] VPEG's investment allowed Predictive Health to commercialize the PULS, from which VPEG in turn received profits.[36]

At a certain time, Harrington, as CEO of Global and majority stockholder of Predictive Health, drafted and executed another agreement between the companies.[37] The new agreement terminated Global's license agreement and replaced it with another license agreement, which was to be renewed monthly.[38] Neither Khalid nor Trivalley were informed of either license agreement.[39] During this time period, Harrington, as Chairman of Global and majority stockholder of Predictive Health,

---

[32] *Id.* ¶ 27.
[33] *Id.* Dr. Harrington and Ms. Harrington failed to hold meetings, provide notice to the other director of Global, provide notice to stockholders, create a written record of board actions, and take minutes of meetings. *Id.*
[34] *Id.* ¶ 29.
[35] *Id.*
[36] *Id.*
[37] *Id.* ¶ 32.
[38] *Id.*
[39] *Id.*

and Mr. Nuñez, as CEO of both Global and Predictive Health, transferred millions of dollars in assets from Global to Predictive Health.[40]

On April 7, 2020, Harrington created a new medical laboratory named Morningstar Laboratories, LLC ("Morningstar"), with the goal of transferring all of Global's remaining assets to Morningstar.[41] Harrington transferred Global's lease of its facilities to Predictive Health and caused Global to enter into a "services contract," where Global would continue to pay the rent and Predictive Health would enjoy the premises for free.[42] Afterwards, Harrington and Nuñez started transferring contracts for Cardiac PULS Tests from Global to Morningstar.[43] The pair also transferred all of Global's laboratory equipment to Predictive Health, and left the equipment leases in Global's name.[44] In addition, Harrington and Nuñez transferred all of Global's employees to Predictive Health.[45] Subsequently, Predictive Health began developing other tests utilizing Global's assets, laboratory space, and employees.[46]

---

[40] *Id.* ¶ 34. In addition, Dr. Harrington and Mr. Nunez caused Global to transfer income to Predictive Health and then caused Global to take out loans to pay its bills and meet its expenses before transferring all of Global employees to Predictive Health. *Id.* ¶ 40.

[41] *Id.* ¶ 35. Morningstar's address was listed as Global's address. *Id.*

[42] *Id.* Global formally leased the space in 2014 on a three-year term with option to renew. *Id.*

[43] *Id.* ¶ 36.

[44] *Id.* ¶ 37. Global continued to be billed and paid taxes on the equipment. *Id.*

[45] *Id.* ¶ 38. Global entered into a contract with Morningstar to continue paying salaries of the employees despite Predictive Health being the actual employer. *Id.* Global remained responsible for 80% of the rent. *Id.*

[46] *Id.* ¶ 39.

### 5. Dr. Khalid and Trivalley Demand to Inspect Global's Books and Record and Remove Global's Board of Directors

On November 13, 2020, Khalid and Trivalley made another attempt to inspect Global's books and records by making a formal demand to the Company.[47] Harrington caused Global to reject their demand.[48] Soon after, on November 25, 2020, Khalid and Trivalley filed an action under Section 220 to enforce their inspection rights.[49] Then, on February 12, 2021, Khalid and Trivalley served written consent of the holders of a majority of outstanding stock of Global, removing all the directors of Global and appointing four new directors (the "New Directors").[50] Khalid and Trivalley filed an action in this Court under Section 225 to confirm the validity of the consent, which I ultimately found valid.[51]

### 6. Global Files a Bankruptcy Action

Harrington, acting as owner of ARK, appointed Angress as director and CEO of Global.[52] On March 11, 2021, Harrington caused Global to file a bankruptcy petition not authorized by the New Directors, which was filed *after* the Harringtons

---

[47] *Id.* ¶ 42.
[48] *Id.*
[49] *Id.* Global did not produce a document in response to the Section 220 demand. *Id.*
[50] *Id.* ¶ 43.
[51] *Id.* ¶ 69; *In re Glob. Discovery Biosciences Corp.*, 2022 WL 1744017, at *7 (Del. Ch. May 31, 2022). I also confirmed that Dr. Khalid and Trivalley held a 55% ownership in Global. *Id.*
[52] Compl. ¶ 49. Burke, Angress, and Harrington were the only ones present for this resolution. *Id.* On May 19, 2021, the bankruptcy court entered an order granting in part Khalid's motion to dismiss.

9

had been removed from the Global board.[53]  On April 19, 2021, Angress attempted to ratify the board's resolution authorizing Global's bankruptcy petition by a written consent signed by himself and Ms. Al-Delemi.[54]

The schedules and statements which were filed in bankruptcy court revealed Predictive Health was the largest unsecured creditor of Global's bankruptcy estate, which amounted to $1.5 million.[55]  It further revealed that the Harringtons unlawfully transferred intellectual property from Global to Predictive Health at some point after Harrington filed suit against Khalid over his ownership of Global.[56] Thereafter, on August 24, 2022, Predictive Health filed an Amended and Restated Certificate of Incorporation with the Delaware of Secretary of State formally changing the company's name from Predictive Health to Smart Health.[57]  On October 31, 2022, the bankruptcy court dismissed the bankruptcy action pursuant to Khalid's and Trivalley's motion to dismiss, which gave control to the New Directors.[58]

---

[53] *Id.* ¶ 51.
[54] *Id.* ¶ 54.
[55] *Id.* ¶ 55.
[56] *Id.* ¶ 61.
[57] *Id.* ¶ 70.
[58] *Id.* ¶ 72.

*B. Procedural History*

Plaintiff filed its original Complaint on December 7, 2022, and later filed an amended complaint (the "Amended Complaint") on April 13, 2023.[59] The Amended Complaint asserts causes of action against Harrington, ARK, Smart Health, Nuñez, Angress, and VPEG.[60] Thereafter, Defendants moved to dismiss the Amended Complaint for failure to state a claim on April 27, 2023.[61] I heard oral argument on Defendants' Motion to Dismiss on August 17, 2023, where I provided a bench ruling.[62]

In the bench ruling, I denied Defendants' motion to dismiss with respect to Count I (Breach of Fiduciary Duty), Count II (Aiding and Abetting Breach of Fiduciary Duty), Count V (Conversion), and Count VIII (Misappropriation of Trade Secrets Under Uniform Trade Secrets Act) without prejudice to Defendants' ability to argue that the Delaware Uniform Trade Secrets Act ("DUTSA") partially preempts the common-law counts.[63] I directed the parties to submit brief supplemental memorandum regarding the basis of the bankruptcy court's

---

[59] Verified Compl., Dkt. No. 1; Compl.

[60] Compl. ¶¶ 32–148.

[61] Defs.' Mot. to Dismiss Pl.'s Am. Verified Compl., Dkt. No. 34. VPEG and Angress were not a part of the joint filing. *See id.* In addition, VPEG and Angress have not entered an appearance in this action. I issued a Rule to Show Cause as to VPEG and Angress. *See* Memo. to Register in Chancery to Show Cause, Dkt. No. 56. The parties did not respond, and I entered default judgment against them at oral arguments on the motion to dismiss. Oral Arg. Tr. 65:17– 69:16, Dkt. No. 62.

[62] Letter Op., Dkt. No. 66.

[63] *Id.*

consideration of the bad faith of Global's bankruptcy filing.[64] On August 23, 2023, the parties entered their supplemental memorandum, and I considered the matter submitted as of that date.[65]

This Memorandum Opinion addresses the remaining counts of Defendants' motion to dismiss for failure to state a claim.

## II. ANALYSIS

Defendants have moved to dismiss the claims under Court of Chancery Rule 12(b)(6). When reviewing such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[66]

I need not, however, "accept conclusory allegations unsupported by specific facts or ... draw unreasonable inferences in favor of the non-moving party."[67] In addition, I refer to certain documents that are incorporated by reference in the Amended Complaint.[68]

---

[64] *Id.*

[65] Defs.' Suppl. Mem. in Supp. of Defs.' Mot. to Dismiss Pl.'s Am. Compl., Dkt. No. 68; Letter in Response to Directive at Oral Arg. Requesting Suppl. Mem., Dkt. No. 69.

[66] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes omitted) (internal quotations omitted).

[67] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020) (citation omitted).

[68] *Id.* at 873 (quoting *Vanderbilt Income & Growth Assoc., LLC v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

*A. Count III: Fraud Against Smart Health and ARK*

Plaintiff asserts a fraud claim against Smart Health and ARK alleging that Smart Health falsely claimed that it was the owner of Global's assets while purportedly knowing that the assets had been wrongfully transferred from Global, and that Smart Health "misle[d]" Global into entering a licensing agreement on the basis that Smart Health owns the PULS.[69] Defendants argue in part that it is a "legal impossibility" that Harrington, as key executive on both sides of the licensing transaction between Global and Smart Health, created a falsification of ownership and tricked himself with that falsification.[70] I agree.

To state a fraud claim, the plaintiff must plead facts supporting an inference that: "(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance."[71] Factors three and four are lacking here.

---

[69] Compl. ¶¶ 96–99.

[70] Defendants also argue that this count is preempted by DUTSA, 6 *Del. C.* § 2001. Opening Br. of Defs. in support of their Mot. to Dismiss Pl.'s Am. Compl. 34–38, Dkt. No. 42 ("DF OB"). Since the fraud claim fails to state a claim, I decline to address whether the fraud claim is preempted by DUTSA.

[71] *DCV Holdings, Inc. v. Conagra, Inc.*, 889 A.2d 954, 958 (Del. 2005).

The Amended Complaint fails to state a claim for fraud pertaining to Harrington's actions in causing Global to enter the licensing agreement because Plaintiff cannot successfully allege that Harrington intended to induce himself to act or refrain from acting. Plaintiff argues that Defendants' proposition of a "legal impossibility" ignores the fact that Smart Health and Global are separate entities.[72] Yet Plaintiff's position is itself anomalous: it essentially states that a corporation's controller acted to defraud himself.[73] Put another way, Global, through its controller Harrington, was aware of the true state of affairs, and cannot have been misled by any false statements of fact that Harrington caused Smart Health to make. Global was acting only through Harrington. Plaintiff's circular reasoning is inadequate to convey an intention of Harrington to induce himself to act or refrain from acting on behalf of Global, or reasonable reliance thereon, as required to support a fraud claim.

In connection with the fraud claim, Global also contends that Harrington and ARK "defrauded" Global by causing repayment of certain loans to ARK.[74] I confess that I do not understand how this states a claim for fraud, although the repayment of the loans may be otherwise actionable.

Accordingly, Defendants' motion to dismiss Count III is granted.

---

[72] Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss Am. Compl. 42–45, Dkt. No. 52 ("PL AB").
[73] *Id.*
[74] Compl. ¶ 99.

14

*B. Count IV: Civil Conspiracy Against Harrington, Nuñez, ARK, Smart and Health*

Plaintiff contends that Harrington, Nuñez, Smart Health, and ARK orchestrated a civil conspiracy by entering into a combination or confederation for purposes of misappropriating Global's assets so they, not Global stockholders, would receive revenue from those assets.[75] Plaintiff further asserts that in furtherance of the conspiracy, Harrington, Nuñez, Smart Health, and ARK used their positions at Global and Smart Health to access Global's documents to facilitate transferring Global's assets to Smart Health.[76]

To assert a claim for civil conspiracy, a plaintiff must allege: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds . . .relating to the object or . . .course of action; (4) one or more unlawful acts; and (5) damages as a proximate result thereof."[77] However, a corporation cannot be deemed to have conspired with its officers and agents since "it cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."[78]

---

[75] Compl. ¶ 101.

[76] *Id.* ¶ 102.

[77] *See Metro. Life Ins. Co. v. Tremont Grp. Hldgs., Inc.*, 2012 WL 6632681, at *19 (Del. Ch. Dec. 20, 2012) (quoting *Matthew v. Laudamiel*, 2012 WL 605589, at *8 (Del. Ch. Feb. 21, 2012)).

[78] *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006); *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952).

Defendants argue that Plaintiff has not articulated a factual basis for including VPEG or ARK in the conspiracy claim, since Plaintiff has not alleged with specificity that VPEG or ARK participated in the transfer of the PULS to Smart Health.[79]  Thus, in Defendants' view, only Smart Health and its agents are left as potential conspirators, and these agents and their principal cannot conspire with themselves.[80]  However, at this pleading stage, it is sufficient that Harrington's knowledge is conceivably imputed to ARK; moreover, VPEG has defaulted with respect to the allegations of the Amended Complaint.  Given the plaintiff-friendly standards here, the Amended Complaint adequately states a claim of conspiracy to convert Global's assets against these Defendants.

Accordingly, Defendants' motion to dismiss Count IV is denied.

*C. Count VII: Tortious Interference Against Smart Health*

Plaintiff argues that Smart Health interfered with Global's ability to form business relationships and Global's existing contracts related to the PULS by usurping the PULS and advertising itself as the owner of the PULS.[81]  Plaintiff further asserts that VPEG participated in Smart Health's interference by funding Smart Health's efforts.[82]  Defendants argue in part that Plaintiff has failed to identify

---

[79] DF OB 38–41.
[80] *Id.*
[81] Compl. ¶ 118.
[82] *Id.* ¶ 119.

16

a breach with existing contracts and further failed to assert with particularity the prospective contracts.[83]  I agree with Defendants.

### 1. Tortious Interference with Contract

To assert a claim for tortious inference of a contract, a plaintiff must establish there is "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."[84]

Plaintiff fails to allege that a breach of contract occurred with respect to the LifeLabs and CHL contracts, the only contracts that the Amended Complaint expressly mentions.[85]  Plaintiff asserts that the Amended Complaint alleges, in conclusory fashion, Defendants' interference with its contracts, however, this is insufficient to survive at the motion to dismiss stage, since Plaintiff must also allege a breach in respect to those contracts.[86]  As such, I find that Plaintiff fails to plead a *prima facie* claim for tortious interference with contract since Plaintiff does not allege a breach of either the LifeLabs nor CHL (or other) contracts.

I note that the Amended Complaint alleges that the Defendants wrongfully assigned or transferred contracts from Global to Morningstar; that does not, in my

---

[83] DF OB 45–47.  Defendants also argue that DUTSA preempts Plaintiff's claim.  *Id.* 25–26.
[84] *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987) (citations omitted).
[85] *See* Compl. ¶¶ 116–120.
[86] PL AB 51; *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987).

view, state a claim for tortious interference. However, those allegations, if proved, are remediable in damages under other causes of action pled in the Amended Complaint.

## 2. Tortious Interference with Prospective Business Relations

To establish a claim for tortious interference with prospective business relations, a plaintiff must establish "(1) the reasonable probability of a business opportunity, (2) the intentional interference by defendant with that opportunity, (3) proximate causation, and (4) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner."[87] Further, "to plead a reasonable probability of a business opportunity, [a plaintiff] must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm."[88]

Plaintiff fails to allege a reasonable probability of a business opportunity. Plaintiff asserts that its lost business opportunities are the commercialization of the PULS and the additional medical tests that Plaintiff could have developed had Defendants not converted Plaintiff's assets.[89] However, nowhere in the Amended

---

[87] *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980).

[88] *Organovo Hldgs, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017) (quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009) (internal quotations omitted)).

[89] PL AB 51; Comp ¶¶ 140, 142. The assets referred to include intellectual property, laboratory space, equipment, and employees.

18

Complaint does Plaintiff assert potential contracts or opportunities that Defendants interfered with.[90] Plaintiff instead gives conclusory statements that Defendants thwarted Plaintiffs' business opportunities, all of which are insufficient to survive at the motion to dismiss stage.[91] Therefore, I find that Plaintiff fails to plead a *prima facie* claim for tortious interference with prospective business relations. Again, the allegations here may support a recovery under other theories pled in the Amended Complaint.

Accordingly, Defendants' motion to dismiss Count VII is granted.

*D. Count X: Breach of Fiduciary Duty – Bankruptcy Against Harrington*

Plaintiff contends Harrington, as a former director of Global, owed fiduciary duties to the Company and asserts that Harrington appointed Angress as director of Global to place the Company into bankruptcy.[92] Plaintiff asserts that Harrington breached his fiduciary duties by unlawfully causing Global to file for bankruptcy to avoid judgment in corresponding litigation.[93] Plaintiff alleges it was harmed by Harrington's actions and has no adequate remedy at law.[94] Defendants argue that the Bankruptcy Code preempts Plaintiff's claim and that because the parties already

---

[90] *See* Compl. ¶¶ 116–120.
[91] *See Enzo Life Scis., Inc. v. Digene Corp.*, 295 F.Supp.2d 424, 429 (D. Del. 2003) (surviving motion to dismiss stage where plaintiff identified a business prospect by pointing to potential customers who were dissuaded from buying a product).
[92] Compl. ¶ 135.
[93] *Id.* ¶ 136.
[94] *Id.* ¶¶ 137–38.

litigated whether the bankruptcy filing was in bad faith, collateral estoppel bars Plaintiff's claim as well.[95]

The Article VI doctrine, known as the Supremacy Clause, requires a state action be declared unenforceable where valid federal legislation preempts state authority.[96] In determining whether state law is preempted, courts look to whether there is express preemption, field preemption, or conflict preemption in the area.[97] Defendants argue that claims based on bad faith filings are preempted here, because the Bankruptcy Code preempts state law tort claims in the entire field of bankruptcy.[98] Title 11 gives federal courts original and exclusive jurisdiction of all cases under it, that is, cases in bankruptcy.[99] Further, Title 11 contains remedies and penalties for the exploitation of its process, presumably including bad-faith abuse of process.[100] Federal authority, however, appears split on whether abuse of process in regard to an improper bankruptcy *filing* is preempted, or whether a state court can entertain an analogous claim.[101] At this plaintiff-friendly stage, the record should be

---

[95] DF OB 48–50.

[96] *See Blum v. Bacon*, 457 U.S. 132 (1982).

[97] *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)).

[98] DF OB 48–50.

[99] 28 U.S.C. § 1334.

[100] *See* 11 U.S.C. § 303(i)(2) (individuals who file involuntary bankruptcy petitions in bad faith are liable for damages); 11 U.S.C. § 362(h) (individuals who willfully violate bankruptcy stays are liable for damages); *Astor Holdings, Inc. v. Roski*, 325 F. Supp. 2d 251, 262 (S.D.N.Y. 2003).

[101] *See Kecki v. Texas Enters., LLC*, 2021 WL 3237134, at *3 (Del. Ch. July 30, 2021) (citing *Nelson v. Emerson*, 2008 WL 1961150, at *8 n.51 (Del. Ch. May 6, 2008)); *In re Bral*, 622 B.R. 737, 744–47 (9th Cir. 2020); *Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414 (3d Cir. 2016); *Robbins v. Fulton Bank, N.A.*, 2018 WL 1693386 (E.D. Pa. Apr. 6, 2018)).

further developed to assist in determining whether Count X is preempted by the Bankruptcy Code, thus Defendants' motion to dismiss relating to this claim is denied on that basis without prejudice to further motion practice upon a record.

I now turn to Defendants' alternative argument of collateral estoppel. The doctrine of collateral estoppel states that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."[102] To trigger collateral estoppel, each of the following four factors must be present: "'(1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.'"[103]

Defendants argue that Count X is barred by collateral estoppel since the parties litigated the issue of bad faith and the bankruptcy court denied relief stemming from the claim that the bankruptcy petition was filed in bad faith.[104] I disagree. The issue previously litigated has not been adjudicated on the merits. It is

---

[102] *Norman v. State*, 976 A.2d 843, 868 (Del. 2009) (citing *Ashe v. Swenson*, 397 U.S. 436, 443 (1970)).

[103] *Id.* (citing *Capano v. State*, 889 A.2d 968, 986 (Del.2006) (Steele, C.J. dissenting)); *Betts v. Townsends, Inc.*, 765 A.2d 531, 535 (Del.2000); *see also* 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE §§ 132–1, 132.04[1][a][ii] (3d ed. 1997)).

[104] DF OB 50.

21

true that the bankruptcy court initially denied *dismissal* based on a theory that the filing had been made in bad faith, and declined to award fees for bad faith pursuant to Section 9011 of the Federal Rules of Bankruptcy Procedure.[105] This ruling, however, was predicated on the ongoing litigation in this Court while it determined ownership and control of Global.[106] This is made clear in the bankruptcy court's final adjudication dismissing the action after determining that Global did not possess corporate authority in the filing of its bankruptcy petition.[107] Also, the order explicitly mentioned that Plaintiff was not foreclosed from pursuing an appropriate motion for sanctions or state law claims.[108] Plaintiff's claim seeking relief for a bad faith filing is not barred through issue preclusion (although, as explained above, still unresolved is whether the claim is preempted).

Accordingly, Defendants' motion to dismiss Count X is denied.

*E. Count XI: Usurpation of Corporate Opportunity Against Harrington and Nuñez*

Plaintiff asserts that Smart Health is developing other medical tests, which Global could have developed if Global still had use of its laboratory space,

---

[105] DF OB Ex. C.; DF OB Ex. F; DF OB 51.
[106] DF OB Ex. C, at 2. "The Court will abstain under Section 1334, Title 28, of the United States Code from adjudicating the disputes among the shareholders or purported shareholders of the Debtor regarding the ownership and control of the Debtor and will allow such disputes to be resolved in connection with the proceedings already pending before the Delaware Chancery Court. . ." *Id.*
[107] Compl. Ex. C, at 2.
[108] *Id.* at 5.

equipment, and employees, amounting to an improper usurpation of Global's opportunity.[109] Plaintiff contends that these medical tests were in Global's line of business.[110] Plaintiff argues that it has been damaged as a result of Defendants' breach of fiduciary duties and there is no adequate remedy at law.[111] Defendants contend that Global has not offered sufficient facts to support that Global had an opportunity to expand into creating additional medical tests, nor Global's financial ability to exploit such opportunity.[112] Plaintiff, in turn, points out that the nature of a corporation's business should be broadly interpreted and that it would have had the financial means to pursue the opportunity had Defendants not looted the Company, and was in a position to fund expansion through borrowing.[113]

The elements of misappropriation of corporate opportunity are: (1) an opportunity within the corporation's line of business; (2) the corporation's interest or expectancy in the opportunity; that (3) the corporation was financially able to exploit the opportunity; and that (4) by taking the opportunity for his own, the corporate fiduciary is placed in a position inimical to his duties to the corporation.[114]

---

[109] Compl. ¶¶ 140–42.
[110] *Id.* ¶ 143.
[111] *Id.* ¶¶ 147–48.
[112] DF OB 54–57.
[113] PL AB 57–59.
[114] *McGowan v. Ferro*, 859 A.2d 1012, 1038 (Del. Ch. 2004), *j. entered sub nom. McGowan v. Ferro, Jr.* (Del. Ch. 2004), *aff'd sub nom. McGowan v. Ferro*, 873 A.2d 1099 (Del. 2005), and *aff'd sub nom. McGowan v. Ferro*, 873 A.2d 1099 (Del. 2005) (citing *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154–55 (Del.1996)).

Plaintiff has sufficiently alleged a *prima facie* claim for usurpation of a corporate opportunity. First, a corporation's line of business is interpreted broadly for purposes of a misappropriation analysis, and here, where Plaintiff receives favorable inferences pursuant to Rule 12(b)(6), Plaintiff has satisfied the first prong of the test by stating its line of business is the development of medical tests.[115] Second, Plaintiff sufficiently states it had an interest in developing additional medical tests, by pointing to Harrington and Nunez who, as fiduciaries of Global, diverted the opportunity to Smart Health.[116] Third, Plaintiff also asserts that it had the financial means to exploit the opportunity by stating that it could have raised funds to do so.[117] Finally, Plaintiff adequately states that Harrington, as the creator of Smart Health and a fiduciary of Global, took a position adverse to the interests of Global.[118]

It is true that Plaintiff's overall basis for litigation is seeking a remedy for the exploitation of its assets. Plaintiff alleges that Defendants looted virtually all of its assets. As I understand Defendants' argument, they point to this as rebutting Global's claim of financial ability to exploit the opportunities which Defendants are now pursuing. I can credit the Defendants, at least, with chutzpah in arguing that,

---

[115] Compl. ¶ 143; *see Dweck v. Nasser*, 2012 WL 161590, at *13 (Del. Ch. Jan. 18, 2012); *see also Pers. Touch Hldg. Corp. v. Glaubach*, 2019 WL 937180, at *16 (Del. Ch. Feb. 25, 2019).
[116] Compl. ¶ 144.
[117] *Id.* ¶ 142.
[118] *Id.* ¶ 145.

24

having allegedly looted Global, Defendants deprived Plaintiff of the ability to demonstrate an element of the tort. Nevertheless, at the 12(b)(6) stage, where favorable inferences are given to Plaintiff, I find the allegations sufficient to survive a motion to dismiss. Additionally, in the context of a record to be created, I may assess how equity should view the financial ability element of the tort, in light of the Company allegedly having been looted by the tortfeasors.

Accordingly, Defendants' motion to Dismiss Count XI is denied.

### III. CONCLUSION

The gravamen of this action is the wrongful conversion of assets from Global by its fiduciaries. Ample legal remedies are available for the full redress of those wrongs, if proven. Some of the Plaintiff's more tangential theories, however, fail to state claims.

For the foregoing reasons, the Defendants' motion to dismiss the Amended Complaint is GRANTED and DENIED in part. The parties should submit a form of order consistent with this Memorandum Opinion.